# COMMUNITY NATURAL GAS CO. v. LANE.

## No. 8245.

Court of Civil Appeals of Texas. Austin.

Oct. 14, 1936.

Rehearing Denied Nov. 4, 1936.

Cox & Brown, of Temple, and Thompson, Knight, Baker & Harris and Pinkney Grissom, all of Dallas, for appellant.

Ned Elnor Moore and De Witt Bowmer, both of Temple, for appellee.

McCLENDON, Chief Justice.

February 12, 1933, Mrs. Lane (the then wife of appellee) died as the result of injuries received in a gas explosion, which occurred the previous afternoon in the kitchen of her rented apartment in Belton. This appeal is from a judgment (upon a special issue verdict) against the gas company in favor of Lane for compensatory damages for his wife's death, alleged to have resulted from the negligence of the gas company in permitting gas to flow into the Lane apartment.

Appellant presents a variety of issues urging 70 assignments of error which cover 61 printed pages of its brief. From our study of the record we have concluded that the facts adduced do not show any liability on the gas company's part; and will therefore confine this opinion to that issue.

The house involved was owned by Gilmer. Originally it had been a single residence, but was later converted into an apartment house with two apartments. It had an east frontage; the apartments being designated as north and south, respectively. There was but one bathroom in the house, which was used by tenants of each apartment. It was situated in the south apartment. About 1928 the gas company laid its street mains and began to supply gas to domestic consumers in Belton, under ^ city franchise. Some time later Gilmer employed Fellrath, an experienced plumber, to pipe the two apartments for gas. Each apartment was piped with a separate system, not connected with each other in any way. The south apartment system supplied a gas water heater in the bathroom for bath use. Each system had a separate feed line leading to the front property line where the gas company installed a meter connected with a service line leading to the main in the street. Gilmer later employed Fellrath to install a by-pass which connected the two apartments. This by-

pass tapped the bath heater line between the heater and its cutoff (globe cock), and was supplied with its own cutoff (globe cock) in the bathroom. It extended under the bathroom floor and over to and connecting with the north apartment system. This arrangement was made in order that the tenant in each apartment might heat the bath water by means of gas from his own system. It is manifest that when both of these globe cocks were open gas could freely flow from one system to the other, but with either or both closed the two systems were entirely cut off the one from the other. The situation may be readily visualized from the following house and gas line systems plan and by-pass diagram:

The evidence establishes (whether or not conclusively is unimportant) that one experienced in gas fittings, upon observing the piping and globe cocks leading to the heater, would readily conclude that the heater was supplied with two separate feed pipes. He would not know where these two feed pipes led without tracing out the lines. In the case of the by-pass this would require going under the house, where it could be readily traced to its connection with the north system. All the expert witnesses testified that this was an unusual arrangement; that usually but one feed pipe led to a single fixture; and that the situation would at once excite suspicion, as indicating two separate sources of gas for

PLAN

ELEVATION - RISERS ① ② & ③

LEGEND
-------- Original Piping
———— New Piping To make tie in
x Floor Openings

PLAN OF
GAS PIPING IN RESIDENCE OF
MRS ADA HARGROVE
BELTON TEX.

the heater. The gas company had no knowledge or notice of the existence of this by-pass.

Both apartments were occupied and supplied with gas through the separate meters for some time after the piping was installed. Later both apartments became vacant and so remained up to the summer of 1932, when the Lanes moved into the north apartment. When each apartment became vacant, the gas company took out the meter and plugged the ends of the two pipes connected with it. The Lanes did not apply for gas in their apartment. Some time in November, 1932, during an absence of the Lanes from their apartment, Mrs. Hargrove rented and moved into the south apartment. Upon her application the gas company installed a meter and turned the gas into the south apartment system. No inspection was made of piping or fittings inside the building; but a meter test was made which showed that there were no leaks in the system. This meter test was made by (1) having the applicant to see that the cutoffs leading to all fixtures connected with the system were closed; and (2) turning the gas into the system and watching the meter for about ten minutes. Any leaks in the system would be shown by the indicator in the meter. The test in this instance showed that there were no leaks in the south apartment system. When the Lanes returned to their apartment the latter part of November, they found the south apartment occupied by Mrs. Hargrove and her daughter. Gas was already being used by them; and Mrs. Lane made an arrangement with Mrs. Hargrove to use the gas heater to heat water for the bath. Mrs. Lane, who during the day assisted her husband in his business, returned to her apartment about 4 o'clock p. m., February 11, 1933, and went into the kitchen. Very shortly thereafter there was a terrific explosion, severely injuring Mrs. Lane. She died the following day. At the time of the explosion Mrs. Lane was alone in the north apartment. Mrs. Hargrove, who was in the south apartment and went immediately into the Lane kitchen, and several other witnesses who went into the Lane kitchen very shortly after the explosion, testified that there was a flame at the end of an uncapped gas pipe which protruded above the kitchen floor. The record affords no explanation of when, by whom, or under what circumstances, this pipe was uncapped. Lane testified that he did not remember ever seeing a cap on this pipe. There is but one other circumstance which we think needs mention. When Mrs. Hargrove moved into the south apartment, she brought as a part of her household furnishings a gas cooking range. She engaged Hill, the gas company's employee who turned on the gas and made the meter test, to install this range in the south apartment kitchen. Hill did not go into the bathroom. Some time later Mrs. Hargrove complained to Hill that the range when in operation gave off odors. Hill informed her that this was due to the fact that the burners did not effect a complete combustion of the gas. Nothing was done to correct this. Other than this, nothing occurred after Mrs. Hargrove moved into the south apartment in November, 1932, and prior to the explosion on February 11, 1933, to suggest any trouble whatever in the gas system. During all of this time the gas was being used in the bathroom water heater.

It is manifest that the explosion was caused from gas which had escaped from the uncapped pipe into the Lane kitchen, and that this gas was let into the north flat system through the by-pass. The sole question upon which appellant's liability depends is whether it violated any duty in not discovering the by-pass and thereupon preventing the explosion. For our present purpose we may assume that, if the duty rested on appellant to inspect the exposed piping above the floor in the south apartment at the time the gas was turned into that apartment for Mrs. Hargrove, a case of liability (in any event factually) would be presented under the theory that such inspection would have disclosed the two feed lines leading to the water heater in the bathroom; and that the dictates of ordinary prudence would require tracing those feed lines to the extent of determining the source of gas supply from each. The result of such tracing would disclose the connection of the two systems, and would require some character of precaution to protect the Lanes from injury resulting from gas flowing through the by-pass into the north apartment system. This is stating the issue involved most strongly in favor of appellee. If no duty to make this character of inspection rested upon appellant, then manifestly no liability could exist as a matter of law.

The generally accepted basic principle governing the liability of gas companies for injuries resulting from escaping gas is

thus stated in note, 29 A.L.R. 1250: "A gas company, since it is dealing with a highly dangerous substance, is bound to use a degree of care commensurate with the danger of its gas escaping and causing injury or damage to the person or property of others. In the absence of contributory negligence, recovery may be had against a gas company for failure to use such care."

Where the escape is from pipes on the premises of a consumer, the rule generally accepted by the authorities is that, absent any obligation imposed by contract, regulation, custom, or franchise (which is the case here), "a gas company which does not install pipes in the consumer's building and has no control over them is not responsible for their condition, maintenance, or defective installation, nor for injuries caused by gas escaping from a leak therein, of which it has no knowledge." 90 A.L.R. 1088, note.

It would serve no useful purpose to attempt an extended review of the cases upon this subject. They are collated and digested in a series of A.L.R. notes: volume 25 A.L.R. 272; volume 29 A.L.R. 1252; volume 90 A.L.R. 1088.

This general rule appellee does not controvert. It is contended, however, that, since this was an apartment house, the case falls within a well-recognized exception to the rule, which is thus stated in 28 C.J. p. 505: "A distinction has been drawn in this respect between the duty owed to an applicant for gas, and the duty, when supplying gas to an applicant, to protect other tenants in the same building, who have not applied for it. With respect to such tenants, it has been held that the company must use reasonable precautions to ascertain that the pipes in the building are in such condition that gas will not flow into their apartments to their injury; and in such the company cannot deny its liability on the ground that it had no right to enter upon the premises of the parties not applying for gas for the purpose of making an inspection of the pipes therein."

Probably the leading case supporting this text is Schmeer v. Gas Light Co., 147 N.Y. 529, 42 N.E. 202, 30 L.R.A. 653, by the New York Court of Appeals in 1895. Other similar cases cited by appellee are Christo v. Gas Co., 18 Ga.App. 454, 89 S.E. 532, 533, and Hayes v. Gas Light Co., 183 App.Div. 182, 170 N.Y.S. 312. See, also, Lynchburg Gas Co. v. Sale, 160 Va. 783, 169 S.E. 577. We have carefully examined each of these cases. They all present the situation of an apartment house supplied with a single system of piping fed from a single feed line leading from the gas company's main. The basis of liability in each rests upon the announced principle that, where the gas company upon the application of one tenant turns (or permits to be turned) gas from its mains into the common system upon the application of one tenant, it must use reasonable precaution to see that the exposed pipes in the rooms or apartments of other tenants, who have not applied for gas, are safe for the introduction of gas into the common system.

The same principle was applied by the Supreme Court of Kansas where two dwelling houses, piped with separate systems, and situated upon separate lots, separately owned, were supplied from a single service pipe connected with a single meter; the two systems being so arranged that, when the gas was turned into the meter, it would flow into both systems unless cutoffs were closed. Swayzee v. Augusta, 113 Kan. 658, 216 P. 265.

The exception does not rest upon the fact that two or more tenants occupy separate portions of the same building, but upon the fact that their several apartments are piped for gas from the same system, and that the supplying gas company has knowledge or notice of this fact, and of the consequent fact that turning the gas into the system upon the application of one tenant will turn it into the apartments of all other tenants whose apartments are connected with that system. It could therefore make no difference whether the several apartments were in the same building or in separate buildings; nor would ownership of the latter be of consequence.

Conversely, where there are two, unconnected systems, each supplied with its own feed line from the mains, and with its own meter, it is unimportant whether such systems are located in separate buildings or in different portions of the same building. The gas company, having no knowledge or notice that such systems have been connected by the owner, is under no duty to discover that fact, or to make any character of test or inspection that would lead to such discovery. This we believe necessarily follows from the principles laid down in the adjudicated cases. Here the gas company made a meter test which would have disclosed a leak had both water heater cutoffs been open and the pipe in the Lane kitchen uncapped at that time. In

that event, the duty would have devolved upon the gas company to refuse to turn on the gas until the leak was stopped, or to take other precautionary measures to prevent injury commensurate with the danger involved. Here was a complete absence of knowledge or notice of any defect in the system into which the gas was turned, and consequently no duty rested upon the gas company to discover the by-pass, or to make any test or inspection of the system in the north apartment.

■ We noted above the fact that Hill had actual knowledge of some character of defect in the burners of the Hargrove range; a fact upon which appellee lays much stress in his brief. Had fumes from this range penetrated into the Lane apartment with resultant injury, we would have an entirely different case. Miller v. Wichita Gas Co., 139 Kan. 729, 33 P.(2d) 130; Clare v. Gas Co., 356 Ill. 241, 190 N. E. 278. The defect in the range burners had no bearing whatever upon the explosion, and the gas company's dereliction vel non in that regard is wholly immaterial. To support liability there must be a causal connection between the injury and the asserted and proved negligence.

The trial court's judgment is reversed, and judgment is here rendered for appellant.

Reversed and rendered.

On Appellee's Motion for Rehearing.

■ Objection is made to our statement that the gas company made a meter test which would have disclosed a leak had both water heater cutoffs been open and the pipe in the Lane kitchen uncapped at the time, on the ground that appellant's agent Hill testified that once in a great while a meter would get "out of fix" and would not register properly. This testimony, in our opinion, had no bearing whatever upon the question of liability. There is nothing to indicate that the meter was out of order. However, if it had been, it would have made no difference, since the only defect in the appliances which had any bearing upon the explosion was the by-pass and the uncapped pipe in the Lane kitchen. Whether this pipe was uncapped at this time no one knew. But, assuming that it was, it was also necessary to escape of gas therefrom for both stopcocks leading to the heater to be open. Evidently such was not the case, as there was no indication of any trouble or leak of any character from this source until the day of the explosion,

which was some three months after the meter test. Manifestly a defect in the meter, of which there is no evidence whatever, had no relation to the injury. If we are correct in our holding that there was no duty on appellant's part to make an inspection of the pipes inside the building, then clearly the record disclosed a case of nonliability.

Motion overruled.

Overruled.