## TEXAS PUBLIC SERVICE CO. v. MIRELES.

### No. 8970.

Court of Civil Appeals of Texas. Austin.

Feb. 19, 1941.

Rehearing Denied March 26, 1941.

White, Taylor & Gardner, of Austin, for appellant.

Bryan Blalock and W. R. Smith, Jr., both of Austin, for appellee.

McCLENDON, Chief Justice.

This is a gas explosion case. The plaintiff (appellee) conducted a small business establishment in a rented building on East Sixth Street in the City of Austin. in the back room of which he and his wife lived. The defendant (appellant) was a public service corporation supplying natural gas to the inhabitants of Austin through its mains laid in the public streets. The damages sought were the value of various articles of merchandise and other personal property destroyed by a fire claimed to have resulted from a gas explosion. The trial to a jury upon special issues resulted in a verdict and judgment for plaintiff for $1,000.

Appellant's brief of 101 printed pages contains eight propositions which present in varied form but three contentions, which may be substantially stated as follows:

1. The evidence does not support the finding that the fire was the result of a gas explosion.

2. There was no evidence of negligence on the part of appellant.

3. Misconduct of the jury in considering attorney's fees in arriving at the amount of damages awarded constituted reversible error.

Appellee has filed objections to consideration of appellant's brief. These we have overruled for the reason that we believe

the above three contentions are sufficiently raised to warrant our consideration.

The first two contentions challenge the sufficiency of the evidence only as a matter of law, and the pertinent evidence is to some extent interrelated. We will therefore state the evidence thereon without attempt at complete segregation and from appellee's viewpoint.

The building in question was a one story frame store building about 12 feet wide and 38 feet long. It fronted south, the front wall being flush with the property line and the floor flush with the sidewalk. There were two rooms. The one in front, the store, was about 12 by 24 feet. The rear room was about 12 by 12 feet. There was a double door in front, a door between the two rooms and a door and window at the back. There were no other openings. The building was very old, in bad repair, and there were cracks in the floor and some on the sides. It was papered, but the papering was in bad repair. The fire occurred about one o'clock p. m., August 15, 1938. Appellee had been a tenant in the building about a year. He paid $6 per month rent. The building was owned by a Mrs. Von K. The floor was approximately 18 inches above the ground at the back which was open below the floor. Immediately to the west was a barber shop, also a frame building, the east wall of which was about one foot west of the west wall of the building. The record does not disclose who owned this barber shop building. Immediately to the east was a brick building. Appellee had been a tenant in the building about a year before the fire. He had never used gas. There was a single 3/4 inch service pipe designed to supply gas both to appellee's store and the barber shop. This service pipe connected with the gas main in Sixth Street, passed under the sidewalk, thence into appellee's store through the wall (apparently the east wall), thence through the floor and west under the floor of the front of the building to the barber shop which was then using gas. There was a meter loop in the building and a meter in the barber shop. As to when or by whom this service pipe was laid, under what arrangement or circumstances or why the particular arrangement of serving two separate buildings with a single service pipe was adopted the record is completely silent. Appellee and his wife, as stated, had their living quarters in the back room of the building. They did their cooking on a small kerosene oil stove which had a supply tank holding ½ gallon of oil. They had just finished their noon meal when the fire occurred and were both sitting in the front room, he mending a watch and she sewing. He described the occurrence as follows:

"When I got my dinner you know and me and my wife went to the front you know and set down, and in a little while I heard the building shake like that, and the radio was there and fell, and I went out in front, out the front door and a little picture on the wall fell, and there was a flash of fire and I run out and it burned my hair too."

There was some corroboration of his testimony regarding the violence of the explosion, and some negative testimony tending to the contrary. The city fire department seems to have very promptly responded to a fire alarm and put out the fire. The damage to the building consisted in burning the wall papering, and some charring of portions of the walls and flooring.

The next morning after the fire the city gas inspector made a test of the service pipe by subjecting it to a pressure of 15 pounds. The inspector had died prior to the trial and the only evidence of the result of this test was from two employees of appellant. They each testified that the pressure gauge dropped about two pounds in twenty minutes. Under the city's regulations neither new construction nor a "repair job" could be approved if the pressure test showed a loss of as much as one-fourth of a pound in fifteen minutes under fifteen pounds pressure. Another test of the service pipe was made the same day by a master licensed gas fitter of several years' experience, who testified he made three separate tests of the service pipe. Each test was made under 15 pounds pressure and in less than four minutes the pressure gauge dropped to zero. Each of the three tests resulted the same. To quote his testimony, "I pumped it up two different times and it fell, and then I pumped it up the third time and waited and every joint on it leaked."

"Q. Every joint? A. Yes, sir, joints and fittings."

Employees of appellant testified that the main supplying the service pipe was in the low pressure area of the city and the gas pressure carried at that season was about four ounces. It was shown that natural gas (that in use) is lighter than air and therefore rises when not confined, that it is odorless, but that appellant used an odor agent that made it very offensive, and that

it will explode when the air is impregnated to the extent of 5% by volume. There was testimony that with this amount of gas one could not endure the odor. Appellee testified that he did not know the smell of gas but "all the time in the early morning when I go up to the front I smell something bad you know." He further testified that at the time of the fire the front door and partition door were open but the back door and window were closed. Shortly after the fire the supply tank or container of the oil stove was found back of the building. The end was blown off. Also a partially melted aluminum coffee pot was found which had been on the stove at the time of the fire. The stove was not located.

It is the theory of appellant that the evidence excludes the hypothesis of a gas explosion upon four grounds: 1. The amount of leakage testified to by the gas fitter was insufficient to permit enough gas to escape from the service pipe with only four ounces of pressure to cause an explosion.

2. The condition of the building and openings at the time would not admit of accumulation of a sufficient amount of gas to cause an explosion.

3. Appellee and his wife could not have remained in the store on account of the odor if the air had been sufficiently impregnated to cause an explosion.

4. The evidence showed that it was an explosion of the oil stove and not a gas explosion that caused the fire.

■ Upon the first two of these grounds the expert testimony is in hopeless conflict. Other than employees of appellant two experts testified, Dr. Schoch of the chemistry department of the State University, and Mr. Boon, a chemical engineer of recognized and admitted technical education, experience and ability. Dr. Schoch's testimony supported each of these grounds. It is not necessary to detail it. Mr. Boon, on the other hand, testified that the amount of leakage shown by the gas fitter's tests would under a four-ounce gas pressure permit sufficient gas to escape to cause the explosion. Upon the second point, he testified that accumulation in sufficient quantities to cause an explosion would depend upon the condition of the building at the time with reference to openings. In answer to hpyothetical questions embodying conditions as testified to by appellee both with reference to the condition of the building at the time

and the character and violence of the explosion, he gave it as his opinion that the explosion was from natural gas. As is usually the case when experts are interrogated hypothetically, the testimony upon this issue is quite voluminous, the questions long and involved. We do not think it would serve any useful purpose to detail it here. The above we believe is a fair statement of Mr. Boon's testimony based upon factors which the evidence will support. This evidence we believe sufficient to support the judgment as against each of the first two grounds. The questions thus presented are purely factual, and within the province of the jury to resolve.

As to the third ground, we think it only necessary to say that the explosion, from whatever cause, manifestly was in the back room, the flames therefrom bursting through the partition door. The gas accumulation must have been begun at the ceiling of the back room and gradually extended downward until contact was made with the flame in the stove. This is the only theory upon which a gas explosion hypothesis can be supported. Any considerable amount of gas accumulation in the store compartment, which was open both at the front and the rear, is extremely improbable. We cannot say, therefore, as a matter of law that the percentage of odor in the store room atmosphere was such that appellee and his wife could not have remained there.

As to the fourth ground, appellant relies upon the evidence that the top of the supply tank was blown off and the aluminum pot was partially melted and testimony of the city fire marshal, who examined the premises shortly after the fire with a view of determining its cause, to the effect that the greatest fire damage was in the portion of the back room where the stove had been; from which fact he drew the conclusion that the fire originated at that point. However persuasive this evidence may seem it is not conclusive in that it does not exclude the theory that the gas explosion brought about the other conditions: that is the explosion of the stove tank and consequent greater heat and fire damage in the region of the stove.

For these reasons we overrule appellant's first contention that the evidence does not support the finding that the fire was caused by a gas explosion.

■ Appellant's second contention, that there was no evidence of negligence on its

part, is based upon the proposition that the evidence conclusively shows that the supply pipe was on private property, was not under the control of appellant, and there was no duty on its part to keep it in repair or inspect it in the absence of notice of a leaky or otherwise defective condition, of which notice, it is asserted, there was none established. The general rule involved in this contention is now well settled. It is thus stated with supporting authorities in Community Natural Gas Co. v. Lane, Tex.Civ. App., 97 S.W.2d 703, 706: "Where the escape is from pipes on the premises of a consumer, the rule generally accepted by the authorities is that, absent any obligation imposed by contract, regulation, custom, or franchise * * * 'a gas company which does not install pipes in the consumer's building and has no control over them is not responsible for their condition, maintenance, or defective installation, nor for injuries caused by gas escaping from a leak therein, of which it has no knowledge.' 90 A.L.R. 1088, note."

We cite this case merely for the principle it announces in this quotation. The facts there were not analogous to the facts here; and while the judgment of this court in that case was reversed by the Supreme Court (133 Tex. 128, 123 S.W.2d 639), the principle above announced was given full recognition.

The facts of the instant case which we regard as controlling under this contention are these: As already stated, the service pipe was designed to serve two separate buildings, the store and the barber shop. The tenant of the store never used gas. When, by whom, or for whose convenience this arrangement was made is not shown by any evidence. The only testimony in the record which might in any way be regarded as having any bearing whatever on this subject is that of the witness Weiser, a chemical engineer in appellant's employ. In answer to a question by appellant's counsel as to who owns "the service pipes in any building," he replied, "I believe the property owner does. The property owner does, that is my understanding.

"Q. The company may put it in, but no matter who puts it in, it belongs to the property owner? A. Yes, sir, that is my understanding."

His cross-examination on this point clearly shows that his testimony was based upon his general understanding and that he had no personal knowledge of the actual facts. We quote:

"Q. About the owner of the service pipes; service pipes as you understand them are the pipes installed on the place from the meter into the property which is being serviced with gas, isn't that right? A. Yes, sir, from the meter.

"Q. Now then, the pipe, a service pipe up to the meter necessarily belongs to the Company doesn't it? A. That depends on whether or not it is on the property owner's lot, if it is on the property owner's lot why then I believe it belongs to the property owner.

"Q. Do you mean to tell the jury that the defendant company does not own a single piece of pipe running under other people's property servicing gas to users? A. Up to the property line, I mean.

"Q. I see, do you mean to tell the jury Mr. Weiser that the defendant does not own one inch of supply pipe supplying gas to meters that are not under or over the property belonging to some of the property? A. Not that I know of.

"Q. You do not know all about the defendant's pipe lines do you? A. No, sir, not all of them.

"Q. And you are one of the chemical engineers of the defendant? A. I am not in that line of work.

"Q. What kind of work are you in, I want to get that straight so I will not have to take up more time? A. Gas measurement."

Hall, gas superintendent of appellant, and Thomas, assistant to Hall in the service department, and in the employ of appellant for twelve years, were both placed on the stand by appellant, but neither was interrogated on this point.

Carmona, who occupied the barber shop, testified in substance: He moved into the barber shop in 1933 at which time appellant put the meter in; "they never came back to fix anything except one time," this occasion he placed in 1935. "I called them because I smelled gas, then a negro who worked for the Gas Company came and fixed the light, and put a mantel on it * * * thereafter, I don't know exactly how long it was, because I did not write it down when I talked again to the Gas Company, and a plumber came and tested the pipe to see if there was any gas leakage, but the smell was then just the same."

302

"Q. Now with reference to that fire, state whether or not you detected the odor of gas in your building in the morning when you would open the door immediately prior to the time of the fire? A. Yes, sir, because I carried the key to my place and am the first one who opens the door, and every morning when the door is opened I smell the gas."

We have examined a great many texts and cases on the subject, but have found no situation which presents a complete analogy to the case at bar. The West Virginia case of Groff v. Charleston-Dunbar Natural Gas Company, 110 W.Va. 54, 156 S.E. 881, announces the rule that the mere ownership of the pipe line is not controlling, and where the gas company exclusively uses a line, not its own, to transport its gas to consumers it is charged with the duty of maintenance and reasonable inspection. In Fakes & Co. v. Fort Worth Gas Co., Tex. Civ.App., 280 S.W. 234, 235, Chief Justice Conner, writing for the Fort Worth Court, held: "We think there can be no doubt but that the evidence given tended to show that the explosion and resultant damage was caused by an explosion of gas that had leaked from the gas lines of the gas company in the street *or from the line in the basement of the Turner & Dingee building,* and that company certainly owed the duty of at least exercising due care to inspect and keep *its gas lines through which it furnished gas to the meter in the back end of the building* in such repair as to prevent leakage and danger of explosion. We therefore conclude that the plaintiff was entitled to go to the jury on the issues of negligence presented in its pleadings, and that the court erred in giving the peremptory instruction." (Italics ours.)

In the Lane case, 133 Tex. 128, 123 S.W. 2d 639, 643, the Supreme Court quotes with approval the following general rule as to the duty of a gas company from 29 A.L.R. 1250: "A gas company, since it is dealing with a highly dangerous substance, is bound to use a degree of care commensurate with the danger of its gas escaping and causing injury or damage to the person or property of others. In the absence of contributory negligence, recovery may be had against a gas company for failure to use such care."

■ The above evidence, coupled with the fact that appellant made no effort to show, by its records or otherwise, the reasons why or circumstances under which the particular arrangement of piping was made, nor the facts incident to the trouble reported to it in 1935, was sufficient, we think, to take the case to the jury upon the issue of its negligence.

■ Upon the hearing on the issue of misconduct, nine of the jurors testified. The other three were subpoenaed, but did not appear. These nine were questioned very minutely upon the subject by counsel for both parties. The transcript of their testimony covers 38 typed pages. It is necessary, we think, only to give its general effect in broad outline. One juror testified unequivocally that attorney's fees were not mentioned in the jury room. Two testified with equal positiveness that if mentioned they did not hear it. Another testified that if mentioned it was so casual he did not remember it. The remaining five remembered that some mention was made of attorney's fees, by whom no one remembered. While their testimony varied as to exactly what was said upon the subject, all agreed that the matter was very casually mentioned and was not considered in arriving at the verdict. There was very little discussion of the amount of the verdict, and the recollection of the jurors generally was hazy on this subject. One seemed to recall that one juryman wanted to award $400, while another was in favor of $2,000. Every juror testified he was not in any degree influenced by the mention of attorney's fees.

No contention is made that the verdict is excessive. We have made a careful examination of the record in this regard, from which the following appears: The suit was filed February 4, 1939, and tried June 14, 1939. In his original petition appellee itemized the various articles destroyed by the fire, giving the value of each. The total amounted to $2,451.50. His testimony followed the allegations of the petition with slight variation; the total according to his evidence being $2,270.35 or $181.15 less than claimed in the petition.

Mr. Von K., whose wife owned the building, was called as a witness by appellant. He testified that he was a certified public accountant and could tell at a glance what kind of a stock of merchandise one had. He had been by the place a number of times and looked in at the front door. In answer to a question by appellee's counsel whether he had ever been inside the store before the fire, he said: "No, sir, I can't say that I was; I went by there a number of times, on various times and could see what he had.

in there and it was all junk. In my line of business I have to check up on invoices and stores of all kinds of goods and I can tell you at a glance whether a man has old junk or has a good stock, and I did not have to check up on this to find that out, I could tell at a glance what he had."

He was called to the scene just after the fire and had a talk with appellee, which he detailed as follows: "I asked him if he carried any insurance and he said he did not, and I said why don't you carry a hundred dollars worth of insurance and he said nobody had asked him to, and I asked him aren't you of age, you ought to know that yourself and carry a little insurance, and then I asked him how much stuff he had in his store and he said he just had a few hundred dollars worth of stuff just old second-hand stuff, old clothes and shoes and second-hand watches." Further: "It was just a lot of old junk, I don't know what all; second-hand shoes, old dresses, hats and shoes, and he had a couple of old radios there; he had no idea of what the value was; . just old things like that, tools and jewelry, and whatever it was he had to repair watches and old things with, I imagine."

He further testified that he employed a truck at his own expense to haul off all the debris, and in this connection:

"I did not let him remain. I told him to get off the place, that I did not want him on the place. When I found out that he had a stove in the place, I said if I had known that you had a stove back there in the store, I would have kicked you out, that I did not rent the place as a residence. I did not want him on the place at all and I told him to get out and get out right away; I did not want him there at all."

"The place belonged to my wife and she sent the yard-man down there to collect the rents; I did not pay any attention to that, it was her place, and I did not go into the back end of the house at all; just in front where he had his old junk, and I did not know he was living in the back end, if I had he would have been out."

The above presents, we believe, a fair picture of what the record shows transpired in the jury room. From it we think it clear that the jury did not take seriously the testimony of Mr. Von K. in estimating the value of the property. Had it done so, the amount must have been fixed at far less than $1,000, even with a liberal allowance for attorney's fees. This is readily explainable, without in any way reflecting upon his integrity. His means of any accurate knowledge of what was in the store was extremely slight. Another important circumstance is his manifest hostility toward appellee as soon as he learned that appellee and his wife had their living quarters and did their cooking in the rear room. On the other hand, the jury were not willing to take appellee's estimates at full value. These they discounted a little over fifty per cent.

There has been much written in this state upon the subject of misconduct of jurors in considering attorney's fees in arriving at the amount of their verdict. Chief Justice Brown, in Houston & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S.W. 606, states the rule thus: "If the evidence taken by the trial judge left it reasonably doubtful as to the effect the statement had upon the amount of the verdict of the jury, we would feel inclined to exercise our authority and set it aside; but the judge who tried the case seems to have acted promptly and fairly in the investigation, and we know that he could form safer conclusions from examining the jurors than this court can from the record. There is much in looking at the man who testifies."

This language is peculiarly apt in the present case. The judge heard the witnesses who testified upon the subject of value and likewise heard the testimony of the jurors. It is a fair inference therefrom, in fact it appears to be a substantially conclusive one, that whatever the mention made of attorney's fees it was very casual, and was not considered in arriving at the verdict, which was amply supported by the evidence and is not and could not be successfully attacked on the ground of being excessive. We do not believe the record before us "leaves it reasonably doubtful as to the effect the statement had upon the amount of the verdict of the jury," and therefore there was no abuse of discretion on the part of the trial judge in overruling the motion for new trial. We do not believe any of the adjudicated cases, when considered in the light of the facts presented, militates against this conclusion. A somewhat analogous situation was presented in El Paso Electric Co. v. Barker, Tex.Civ.App., 116 S.W.2d 433, 437, reversed on other grounds, 134 Tex. 496, 137 S.W. 2d 17, wherein it was said:

"It is but natural that extraneous matters will subject themselves into a general

discussion relative to the matters at issue, but unless the discussion is of a character that might possibly affect the verdict in some respect complained of upon appeal, an appellate court would not be justified in putting parties and the public to the expense of another trial. Appellant does not claim that the amount awarded was excessive or that in that particular the judgment was unjust. * * * There can be no reasonable doubt that the result insofar as appellant complains of it was unaffected by the mention of attorneys' fees."

The trial court's judgment is affirmed.