**LONE STAR GAS COMPANY, Appellant,**

**v.**

**H. G. VEAL, Appellee.**

**No. 3864.**

Court of Civil Appeals of Texas.

Eastland.

April 20, 1964.

Rehearing Denied May 1, 1964.

———◆———

Mays, Leonard, Moore & Dickson, Sweetwater, Jackson, Walker, Winstead, Cantwell & Miller, D. L. Case and Jack Pew, Jr., Dallas, for appellant.

Bates & Brock; Warner F. Brock, Houston, Ratliff & McCloud, Colorado City, for appellee.

GRISSOM, Chief Justice.

In a trial to the court, H. G. Veal obtained a judgment against the Lone Star Gas Company for damages caused by an explosion of gas which escaped from Veal's yard line. The gas company appealed.

In September, 1953, Mr. Veal laid 53 feet of new black steel pipe from the gas company's main at a street, or parkway, across his yard to the company's meter near plaintiff's building. Lone Star determined the location of its meter and the point where Veal's yard line was connected with Lone Star's main line at the parkway. The yard line was tested and approved by the City plumbing inspector. Lone Star then made its connections with Veal's yard line at its main line in the parkway and at its meter near Veal's building.

In November, 1957, Mr. Veal told Lone Star that he smelled gas in his building. Lone Star gave its employees instructions to check for leaks and they checked for gas leaks inside Veal's building and outside the building on the outlet side of its meter. The check made showed there was no gas escaping from the outlet side of its meter.

They did not check any other pipes owned by Veal. They advised Veal that gas was not escaping, that the odor probably came from materials used in his shoe repair business. Lone Star did not test that part of Veal's line which ran between the company's meter and its main line at the parkway. The test made could not have disclosed a leak in the yard line between said points. Thereafter, each month, Lone Star employees read the gas meter and some of its employees were occasionally in Veal's building.

In July, 1960, Lone Star, as a matter of routine policy and not because of any defects therein, replaced the old meter. When the new meter was installed, Lone Star turned off all appliances inside Veal's building and made a five minute meter test of the same kind and scope that it had made in 1957, that is, it tested the outlet pipes and inside Veal's building, but it did not test that part of Veal's yard line between its meter and its main line at the parkway. There was evidence to the effect that there were then holes in the yard line from which gas was then escaping.

Lone Star kept a record entitled "Summary of Town Plant Unaccounted-For Gas" which showed there was more gas measured through the city gate meter than was sold to its customers. It was stipulated that one factor showing that difference was the leakage of gas in all the pipes between the city gate meter and the meters of its customers. In Colorado City Lone Star had a program for checking its own lines for leaks but it did not inspect or test any customer's yard line unless its meter was located at its main line, it saw evidence of leaks in a yard line or a customer requested inspection of his yard line.

On April 4, 1961, there was an explosion of gas in the basement of Veal's building. The gas that exploded came from corrosion holes in Veal's yard line, which was used by Lone Star to deliver its gas to Veal at its meter adjoining his building. It had not passed through Lone Star's meter and

the gas that exploded was still owned by Lone Star. The holes from which the gas escaped were scattered along 20 feet of the yard line. The gas entered the basement from such corrosion holes in the yard line through an opening in the east wall of the basement.

In a trial to the court, the court found that Veal's yard line was exclusively used by Lone Star to transport its gas to Veal; that said yard line was under the exclusive control of Lone Star; that the yard line served but one purpose, that is, to carry Lone Star's gas to its meter where it was delivered and sold to Veal; that Veal had no right to interfere with the yard line; that Veal could not control the flow of gas into the yard line because Lone Star had not provided him means to shut it off; that Lone Star, by the use of means available, could have discovered in July, 1960, that gas was escaping from the yard line. The court further found that Lone Star owed Veal the duty to inspect the yard line for leaks; that in July, 1960, Lone Star could have, by use of means available, discovered that gas was escaping from the yard line and that Lone Star then had the duty to test the service line for leaks; that before the explosion Lone Star knew, or should have known, that the yard line would develop gas leaks within two to five years; that the yard line should have been replaced every two or three years, because at that location a line will develop leaks every two or three years, and that holes had existed in the yard line and gas had escaped therefrom for more than a year before the explosion. The court found that from November, 1957 to the time of the explosion, Veal relied upon the assurance of Lone Star that the odor in his building was not caused by escaping natural gas but that it came from materials used in his business.

Although Lone Star presents 137 points of error it summarizes its contentions substantially as follows: (1) Lone Star is not liable because it had no duty to inspect Veal's yard line; (2) it was not guilty of any act of negligence found by the court; (3) appellee was contributorily negligent and (4) appellant is not liable because under its contract with Veal it is not responsible for appellee's yard line.

Appellee contends that, since the yard line was used solely and exclusively by Lone Star to transport its gas to its meter where the gas was measured, delivered and sold to Veal, Lone Star had a duty to inspect the yard line, the same as if it owned it. That contention is stated to be the law in 26 A.L.R.2d 141. Texas Public Service Company v. Mireles, Tex. Civ.App., 149 S.W.2d 298, 302, (Writ Dis. C.J.), cites with approval the holding in the West Virginia case of Groff v. Charleston-Dunbar Natural Gas Company, 110 W. Va. 54, 156 S.E. 881, that mere ownership of such a pipe line is not controlling, and, where a gas company exclusively uses a line, not its own, to transport its gas to consumers it is charged with the duty of maintaining and inspecting the pipe line. In Houston Gas & Fuel Co. v. Perry, Tex. Civ.App., 55 S.W.2d 901, affirmed 127 Tex. 102, 91 S.W.2d 1052, the court recognized the duty of a gas company to inspect pipes of another under its control. The Texas courts apparently recognize the duty of a gas company to inspect gas lines of its customers which it uses exclusively to contain and convey its gas to its meter, where it is sold and delivered to its customers. Certainly, that is the rule in most jurisdictions.

In Washington Gas Light Company v. District of Columbia, 161 U.S. 316, 16 S.Ct. 564, 40 L.Ed. 712, lack of ownership of a gas box was first asserted as showing the absence of a duty to inspect. The court said that the object of the gas company was to sell gas to its consumers, which it could not without connections between its street mains and abutting dwellings and, when this is done, its highly inflammable product flows from its mains into such dwellings. It said that a gas company must have necessarily contem-

plated that such connections with its mains as are, from their very nature, incidental to and inseparably connected with the sale and consumption of its gas, should be a part of the apparatus of the gas company, and be under its control, rather than under the control of the consumer. It said, "Indeed, the control by the gas company of the connection from its mains to the point of use is as absolutely necessary to make it possible for such company to carry out the very purpose of its charter as are the retorts and mains. * * * Nor do we think that this duty was affected by the circumstances that the cost of the labor and materials used in the construction of the connection and gas box was paid by an occupant or owner of property who desired to be furnished with gas. As the service pipe and stopcock was a part of the apparatus of the company, and was used for the purpose of its business, it is entirely immaterial who paid the cost, or might, in law, on the cessation of the use of the service pipe and gas box by the company, be regarded as the owner of the mere materials."

An ordinance of Colorado City provides that "Under no condition shall plumbers, fitters or other parties disconnect any meter, connect or *disturb piping on inlet side of meter* after once set except that a Plumber may close the gas cut off for the purpose of making repairs * *." (Emphasis ours.) There was evidence that means were not available to Veal to cut off the gas that entered his yard line from the company's main line. The yard line, although owned by Veal, was actually as much a part of the apparatus of Lone Star in transporting and selling its gas as was Lone Star's main or meter; without the yard line, Lone Star could not deliver and sell gas to Veal. As held in the cases mentioned, a gas company's duty to inspect a yard line is not determined by its ownership.

In Mattson v. Central Electric & Gas Co., 8 Cir., 174 F.2d 215, the trial court held, as a matter of law, that a gas company in the absence of actual notice of a defect in the consumer's supply line between the gas company's main and its meter, was not liable for the escape of its gas from said line. In reversing the judgment of the trial court, based on that theory of the law, the Circuit Court said:

"The gas company in the Julian case [Julian v. Sinclair Oil & Gas Co., 168 Okl. 192, 32 P.2d 31] contended, as in the instant case, that it was not the owner of the pipes at the point where the gas escaped, and hence, was not charged with the responsibility of inspection nor liable for injuries caused by faulty materials which it did not own.

* * * * * *

"* * * The natural gas which the Company was transmitting through this pipe was of highly dangerous character and it owed a duty to the public to exercise a degree of care commensurate with the danger involved in the transaction of its business. It knew when this gas line was laid and it was its duty to know what the probable life of the gas pipe would be in the soil where it was laid. While the defendant did not have actual notice that gas was escaping from this perforated pipe, it did know that gas would escape from a perforated pipe and it was charged with knowledge, at least the jury might have so found, that this pipe had probably become perforated. * * * Under the circumstances disclosed by the record the jury might properly have charged the Company with constructive notice and if so that notice is just as effective as actual notice. While the foundation of liability for negligence is knowledge, in law an opportunity by the exercise of reasonable diligence to acquire knowledge is equivalent to knowledge, and one under a duty to use care for which knowledge is necessary cannot avoid

liability because of voluntary ignorance. * * *

* * * * * *

"Under the Nebraska decisions the Gas Company could not delegate the duty it owed to the public to exercise proper care to maintain its gas system in a safe condition, but it had the continuing duty to exercise proper care to prevent injury from escaping gas. Hence, the mere fact that the service pipe was paid for and possibly was the property of the consumer, did not shift the duty of exercising proper care. The gas in the service pipe, as before noted, was that of the defendant, and as long as it remained its property it was under the duty of using proper care to protect the public from injury caused by the dangerous propensities of that property. A proper regard for the safety of the public would seem to forbid the owner of such a dangerous agency to avoid liability for damage by simply housing such property in a container belonging to some one else, particularly when the owner of such dangerous agency knows, or is charged with knowledge, that the housing or container facilities are in a decayed, dilapidated and deteriorated condition. The agents and employees of the Company are presumably skilled in the business of their employer. They knew, or were presumed to know, the probable life or durability of the materials used, and where the pipes have been in use as long as the pipes in the instant case, the jury might reasonably find that the Company was charged with notice of their condition."

The Mattson case is especially pertinent here on its holding that the gas company had a duty to know the probable life of the yard line in the soil where it was laid. Lone Star knew when the yard line was laid and that in some locations in Colorado City such pipes would probably last only three to five years.

In Weiss v. Gas Service Co., 170 Kan. 43, 223 P.2d 702, 26 A.L.R.2d 129, the Supreme Court of Kansas said:

"We think it well settled by our decisions that when a gas company connects service lines to its mains it has a duty to know that the service lines are capable of carrying the gas. This is upon the ground and for the reason that gas is such a dangerous thing when it escapes from service lines that due care under the situation requires such an inspection irrespective of whether the gas company, or some other person, owns such lines."

In Manning v. St. Paul Gaslight Company, 129 Minn. 55, 151 N.W. 423, 424, L.R.A.1915E, 1022, it was shown, as it was in this case, that the consumer owned the gas pipe from his lot line to the company's meter. The Supreme Court of Minnesota said:

"The gas belongs to defendant until sold and delivered through its meter in the consumer's building, and therefore defendant should be responsible for its care until it is so measured and delivered. We are unable to find any sound basis for making defendant's care and vigilance to prevent the escape of its dangerous product any less between the meter and the lot line, than between the lot line and the retort where manufactured."

In Fabbrizi v. Village of Hibbing, 242 Minn. 464, 66 N.W.2d 7, under a fact situation comparable to that of the present case, where gas escaped from a leak in the consumer's service line, the court said:

"The fact that a gas company did not install the service lines or own them has been held not to relieve it from liability for injuries caused by defects in such lines where the company assumed or exercised control over them. "The service line involved here served but one purpose and that was to carry defendant's gas to the meter. Under

the evidence, plaintiff had no right to interfere with the line or to permit a plumber to do so without first obtaining permission from the defendant. There was no way in which plaintiff could control the flow of gas in the line as defendant had provided no shut-off valve or other means of control. Defendant, while using said service line for the transmission of its gas to the meter, was in exclusive control of the line irrespective of ownership. Having been given the right of exclusive control of the line, it owed the corresponding duty of exercising reasonable care to keep it in a proper state of repair so as to prevent the escape of gas, a highly dangerous and destructive product when allowed to get beyond control."

Applying that decision to the instant case, the yard line served but one purpose, to carry Lone Star's gas to its meter where it was sold and delivered to Veal. Veal had no right to interfere with it. Veal could not control the flow of gas to the yard line. Under the circumstances, appellant owed appellee the duty to inspect the yard line.

In Daugherty v. Nebraska Natural Gas Company, 173 Neb. 30, 112 N.W.2d 790, the gas company contended that it did not own the line where the defect was found; that it belonged to its customer and, therefore, the gas company owed no duty to its customer to maintain the yard line. The Supreme Court of Nebraska said that the mere fact that the service pipe was owned by the consumer did not shift the duty of exercising proper care; that the gas in the yard line belonged to the gas company and, as long as it belonged to the gas company, it had the duty of using proper care to protect the public from injury caused by the dangerous propensities of its property and that proper regard for the safety of others forbade its owner from avoiding liability by simply housing the gas in a container belonging to someone else, when the gas company was charged with knowledge that the container was in a decayed condition.

In Northwestern Ohio Natural Gas Co. v. First Congregational Church, 126 Ohio St. 140, 184 N.E. 512, the Supreme Court of Ohio said:

"When a gas company has the exclusive use of a pipe line not its own to conduct gas to a consumer, the company assumes the duty of reasonable inspection and maintenance of the line while it is so used."

The same court made the same ruling in Hamden Lodge No. 517, I.O.O.F. v. Ohio Fuel Gas Co., 127 Ohio St. 469, 189 N.E. 246.

In Julian v. Sinclair Oil & Gas Co., 168 Okl. 192, 32 P.2d 31, the gas company contended that because it did not own the service pipe from which the gas escaped it had no duty to inspect it and that it was not liable for injuries caused by faulty material which it did not own. The Supreme Court of Oklahoma held the gas company liable because it had control of the leaky pipes in the yard line.

In Stenger v. Hope Natural Gas Company, 141 W.Va. 347, 90 S.E.2d 261, the Supreme Court of West Virginia said:

"The defendant having the exclusive use of the gas line in conducting gas to the Stenger residence, assumed the duty of reasonable inspection and maintenance of the line while it was so used."

In Commerce Insurance Company v. Merrill Gas Co., 271 Wis. 159, 72 N.W.2d 771, the gas company contended that it had no duty to maintain the gas apparatus inside the curb line, because it was installed by the consumer at his expense upon his own property and he owned it. The Supreme Court of Wisconsin said that it did not follow that the gas company had not assumed exclusive control of the pipe, or that it was not liable for negligence in re-

gard to its assumed exclusive control of such a pipe line.

In Shaw v. Wisconsin Power & Light Company, 256 Wis. 176, 40 N.W.2d 498, 13 A.L.R.2d 1390, the same court held, in effect, that a gas company has the duty to keep the pipe in which its gas is stored in good condition.

■ The gas belongs to the gas company until it is sold and delivered to the consumer at the company's meter, 38 C.J.S. Gas § 40, page 730; Sutcliffe v. Fort Dodge Gas & Electric Co., 218 Iowa 1386, 257 N.W. 406.

■ Under the facts found by the trial court, which, we think, are amply supported by the evidence, it properly concluded that appellant had the duty to inspect the yard line. We think the court did not err in holding that appellant was guilty of negligence in failing to inspect the yard line and that same was a proximate cause of appellee's damages. The court had a right to conclude that if Lone Star had inspected the line during the year before the explosion that it would have discovered the leaks which caused it.

Appellant relies chiefly upon our decision in Henderson v. City of Cross Plains, Tex. Civ.App., 235 S.W.2d 936, (WR), to support its contention that it had no duty to inspect appellee's yard line. Our decision here is in accord with that decision. The gas that escaped in the Henderson case did not belong to the gas company. It had already been metered, sold and delivered to the customer. The lines from which that gas escaped were on the outlet side of the meter and not under the control of the gas company. Lone Star Gas Company v. Striplin, Tex.Civ.App., 342 S.W.2d 359, is also distinguishable. There, the escape of gas was caused by a third person running into a meter a short time before the explosion.

■■ Whether Veal was contributorily negligent was, at most, a question of fact

which the court decided in his favor. The court had the right to conclude that Lone Star's employees were experts, specialists, in the detection of gas leaks and that Veal was not. In 1957, Veal told Lone Star that he smelled gas in his building; Lone Star's employees investigated for leaks and told him that he was mistaken, that the odor came from materials Veal used in his business. There was evidence that Veal relied upon that assurance and for that reason he did not thereafter complain to Lone Star of such odor. Neither had actual knowledge that gas was escaping from the yard line. It is more reasonable to conclude that the gas company's employees should have known about the escaping gas than that Veal should have known thereof. Contributory negligence is usually a question of fact. It was certainly not conclusively established here.

■ Construing the gas company's "application for gas service", which Veal was required to sign to obtain gas, most strongly against its author, as we are required to do, it did not include the yard line in question. However, if it did, the provision amounted to an attempt by the public utility to exempt itself from liability for its own negligence, which is contrary to public policy and unenforceable. 13 Tex.Jur. 385; 175 A.L.R. 8, 39; 38 C.J.S. Gas § 42, pages 731, 735; Oklahoma Natural Gas Company v. Appel, (Sup.Ct.Okl.), 266 P.2d 442; Fairfax Gas & Supply Co. v. Hadary, 4 Cir., 151 F.2d 939; 24 Am.Jur. (Pocket Part 1963), Sec. 23, p. 109.

The court found that appellant was negligent in failing to inspect the yard line and that such negligence was a proximate cause of appellee's damages. We approve those findings. The court had a right to conclude from the evidence that gas was escaping from the yard line for more than a year before the explosion; that the gas company should have known thereof; that if it had inspected the line during the year before the explosion it would have discov-

ered the leaks. The evidence supports the findings that are essential to support the judgment. We have considered all of appellant's points. They are overruled. The judgment is affirmed.