Houson D. WILLIAMS, Petitioner,

v.

Sherry Yvonne PATTON, Respondent.

No. D–0353.

Supreme Court of Texas.

Oct. 30, 1991.

Rehearing Overruled Feb. 5, 1992.

Gary L. McConnell, Angleton, for petitioner.

Lenette Terry, Angleton, for respondent.

## OPINION

COOK, Justice.

This case presents the question whether section 14.41(a) of the Texas Family Code prohibits parents from settling claims for child support arrearages before the unpaid amount has been reduced to a final judgment. We hold that section 14.41(a) does prohibit such settlements. Therefore, we affirm the judgment of the court of appeals. 796 S.W.2d 526 (1990).

Houson D. Williams and Sherry Yvonne Patton were divorced in 1974. Patton was named managing conservator of their only child, Amy Diane Williams, and Williams was ordered to pay $121 per month in child

support. Williams failed to make his support payments between August 1977 and October 1985.

On October 15, 1985, when Williams was $9,885 in arrears, Patton filed a motion for contempt for failure to pay child support, and a motion to modify child support. While these motions were pending, Williams and Patton entered into a settlement agreement in which Williams promised to pay Patton $2,850 upon execution of the agreement and agreed to a modification of the divorce decree increasing the amount of his child support payments to $325 for the next 18 months and to $350 thereafter until the child reached the age of 18 years or was emancipated. In return, Patton agreed to release Williams from his obligation for the arrearages and also authorized and directed her attorney to obtain a dismissal of her contempt action with prejudice.[1]

On May 13, 1986, the trial court signed an "Agreed Order Modifying Prior Order" and an order dismissing Patton's contempt motion.[2] The agreed order increased the monthly child support payments as provided in the settlement agreement but did not release Williams from his obligation for the child support arrearages. Neither of the court's orders referred to the settlement agreement or acknowledged its existence in any way.

Williams paid Patton $2,850 and complied with the terms of the agreed order for about a year and a half. When Amy moved to Williams's home in November 1987, however, he discontinued all payments, in violation of the agreed order. In August 1988, Patton brought a second motion for contempt, citing Williams's nonpayment of child support since November 1987 as well as his nonpayment of support from 1977 to 1985. Williams asserted the settlement agreement as a defense to the contempt action for the 1977–1985 arrearages and also filed an original petition alleging that Patton had breached the agreement by seeking to hold him in contempt for the 1977–1985 arrearages.[3] Patton cross-claimed for breach of the agreement, citing Williams's failure to pay child support after November 1987.

After a nonjury trial, the trial court held that the settlement agreement was void and rendered a take-nothing judgment on both parties' breach of contract actions. The court also adjudged Williams to be in contempt and sentenced him to fifteen days in jail, but suspended imposition of the sentence.

Williams appealed to the court of appeals, asserting that the agreement was enforceable and that he was entitled to specific performance of the agreement.[4]

1. In pertinent part, the settlement agreement provides:

   [I]n consideration of the payment of the sum of $2,850.00 by HOUSON D. WILLIAMS, JR. to SHERRY YVONNE (WILLIAMS) BAILES, payable in full upon the execution of this agreement, and for the further consideration of the agreement of HOUSON D. WILLIAMS, JR. to an Agreed Order Modifying Prior Order whereby the Decree of Divorce of December 2, 1974, shall be modified in certain respects, including increasing the support payment by HOUSON D. WILLIAMS, JR. for the use, benefit and support of AMY DIANE WILLIAMS to the amount of $325.00 per month for eighteen (18) months ... and thereafter in the amount of $350.00 per month until the said child reaches the age of eighteen (18) years ... SHERRY YVONNE (WILLIAMS) BAILES does hereby RELEASE AND DISCHARGE HOUSON D. WILLIAMS, JR. ... of and from any and all claims, demands, damages, actions, causes of action ... arising from the obligation of HOUSON D. WILLIAMS, JR. for

   the payment of child support ... for the period from and after December 2, 1974 to March 31, 1986.

   SHERRY YVONNE (WILLIAMS) BAILES simultaneously by these presents does hereby authorize and direct her attorney to execute and deliver for entry such instruments as may be necessary to obtain dismissal of the Motion for Contempt for failure to pay child support above mentioned, with prejudice to her ever refiling the same for any claim for child support for the period between December 2, 1974 and March 31, 1986....

2. This dismissal was without prejudice.

3. Williams also filed a motion to modify the divorce decree. The trial court denied this motion and the court of appeals affirmed. In his petition to this court, Williams does not challenge this part of the court of appeals' judgment.

4. In his petition, Williams conceded that the contempt order was itself not reviewable on

He conceded that, under the Family Code, parents cannot *prospectively* modify the amount of court-ordered child support payments without the approval of the trial court. *See* Tex.Fam.Code § 14.08(a) (modification of child support in a decree can only be accomplished by filing a motion in the court having jurisdiction of the suit affecting the parent-child relationship); *see also Ex parte Colley,* 621 S.W.2d 649, 651 (Tex.App.—Austin 1981, orig. proceeding); *In re McLemore,* 515 S.W.2d 356, 357 (Tex. Civ.App.—Dallas 1974, orig. proceeding). However, he argued that parents may nevertheless legally agree to settle a claim for *past* unpaid child support. The court of appeals disagreed, holding that, under Texas Family Code section 14.41, child support arrearages also remain under the supervision of the trial court and may not be modified by the parties without court approval until the court either (1) reduces the unpaid child support to written judgment or (2) loses jurisdiction.[5] 796 S.W.2d at 530. Because neither of these conditions was met in this case, the court concluded that the settlement agreement was void and unenforceable and affirmed the judgment of the trial court.

Section 14.41(a) of the Texas Family Code provides:

**Judgment for Past–Due Child Support Payments**

(a) Judgment for Arrearages. A periodic child support payment not timely made shall constitute a final judgment for the amount due and owing. On the motion of an obligee or obligor, after notice and hearing, the court shall confirm the amount of child support in arrears and shall render judgment against an obligor for any amount of child support unpaid and owing. The judgment rendered by the court may be subject to a counterclaim or offset as provided by Subsection (c) of this section. The judgment may be enforced by any means available for the enforcement of judgments for debts.

Tex.Fam.Code § 14.41(a).

In its opinion the court of appeals pointed out that the trial court is required to confirm the amount of arrearages before rendering judgment and, in doing so, must consider offsets as provided in section 14.41(c), although it cannot reduce or modify the amount of arrearages. 796 S.W.2d at 530. In addition, the court of appeals emphasized that 14.41(b) set a time limit on the trial court's jurisdiction to "enter judgment for past-due child support obligations." *Id.* From a consideration of these provisions, the court concluded that the legislature intended for arrearages to remain under the supervision of the trial court until the court reduces the unpaid amount to written judgment or until the court loses jurisdiction. Thus, the court held that section 14.41(a) prohibits parents from contracting for payment of the arrearages without court approval until after the occurrence of either of those two events. We agree.

▮ The legislature intended that courts exercise independent judgment in matters affecting children, including the support obligation. In addition to denying the district court the authority to forgive child support arrearages under section 14.41(d), the legislature has also prohibited self-help by the obligor and obligee in prospectively modifying court-ordered child support without court approval. Tex.Fam.Code § 14.08(a). Furthermore, the legislature has expressly required that parental agreements concerning child support be approved by

---

appeal. *See Ex parte Cardwell,* 416 S.W.2d 382, 384 (Tex.1967). However, he argued that granting him specific performance of the agreement would necessitate "disposing" of the contempt proceedings, in addition to other relief.

**5.** At the time of the trial court judgment in 1988, Family Code section 14.41(b) provided that the trial court retained jurisdiction until two years after the child reached majority or two years after the date on which the child support obligation terminated pursuant to the decree or order or by operation of law. *See* Act of May 27, 1985, 69th Leg., R.S., ch. 232, § 9, 1985 Tex.Gen.Laws 1158, 1163 (eff. Sept. 1, 1985), *amended by* Child Support Enforcement Act of 1986, 69th Leg., 2nd C.S., ch. 10, § 6, 1986 Tex.Gen.Laws 15, 17 (eff. Jan. 1, 1987). The current version of section 14.41(b) extends the time limit from two years to four years. Tex. Fam.Code § 14.41(b).

the court, which can accept or reject the agreement depending on whether or not it is in the child's best interest. Tex.Fam. Code § 14.06(a)–(d). These provisions of the Texas Family Code indicate that the legislature intended that the court closely supervise child support proceedings to guarantee that the best interest of the child is always considered.

In addition to guaranteeing that the court closely supervise child support determinations, insisting that the arrearages be reduced to final judgment before the parties enter a settlement and release agreement accomplishes the primary purpose of section 14.41(a). The purpose of section 14.41(a) is to provide a custodial parent with remedies for nonpayment of child support in addition to contempt. Once the custodial parent obtains a money judgment for the amount of arrearages, this judgment may be enforced by any means normally available to a judgment creditor. Requiring that the trial court reduce arrearages to a final judgment before the parties can enter into a settlement and release agreement shields the custodial parent from the financial pressures which frequently result when child support goes unpaid. It is well documented that the years following divorce are generally very difficult financially for the custodial parent. *See* L. Weitzman, *The Divorce Revolution* 232 (1985); Cox, Economic Support of Children by Fathers Following Divorce, in *The Parental Child–Support Obligation* 157–58 (J. Cassetty ed. 1983). The economic hardships faced by the custodial parent can be attributed to numerous factors, including insufficient child care facilities, inflation and inadequate child support awards aggravated by frequent defaults.

Due to the financial hardships so frequently encountered by the custodial parent following divorce, the failure of the former spouse to pay court-ordered child support puts the custodial parent in a very difficult position. If the non-custodial parent offers to pay a portion of child support arrearages in settlement of the entire amount due, the custodial parent may be persuaded to accept the offer due to present financial difficulties and the possibility of further delay and expense in collecting the unpaid amount.

The dissent concludes, however, that the Family Code does not restrict the ability of parents to settle claims for arrearages. Noting that the trial court has no authority itself to reduce or modify the amount of child support arrearages, the dissenting opinion states that forcing parents to reduce arrearages to judgment before they can modify the amount imposes an "unnecessary, time-consuming, and expensive procedure on parents reasonably desiring to compromise a debt for child support arrearages."

In characterizing this procedure as "unnecessary," the dissenting opinion ignores the fact that requiring the reduction of arrearages to judgment helps ensure the payment of child support. If non-custodial parents know that, at some future time, they can pressure the custodial parent into a settlement agreement releasing them from the obligation to pay arrearages, non-custodial parents will be tempted to forego the payment of child support until it becomes an unmanageable sum. The non-custodial parent can then take advantage of the financial pressures resulting from such arrearages to persuade the custodial parent to accept an offer of partial payment in settlement of the entire amount owed. In doing so, non-custodial parents not only escape their duty to pay child support but profit from their own wrongdoing. By giving the non-custodial parent the opportunity to negotiate such agreements, the dissenting opinion would actually *encourage* the non-payment of child support.

Encouraging the non-payment of child support would only exacerbate the problem of enforcing court-ordered child support which has been, and continues to be, a very significant problem. In 1985, the total amount of child support payments due nationwide was $10.9 billion, but payments actually received only totalled $7.2 billion. 1 U.S. Dep't of Health & Human Services, Office of Child Support Enforcement, *Twelfth Annual Report to Congress for the Period Ending September 30, 1987* 5

(1988). These figures just begin to show the magnitude of the problem.

The procedure of reducing child support arrearages to final judgment is certainly *not* an unnecessary procedure and an expensive waste of time. Once the court confirms the amount in arrears and renders judgment for the amount owing, the obligee can enforce that judgment by any of the means available for the enforcement of judgments for debts, such as garnishment or attachment. If the custodial parent then wishes to enter into a contract regarding the amount and method of payment by the obligor, the custodial parent does so having all of these additional remedies available. This places the custodial parent on more equal footing with the obligor when negotiating such an agreement and diminishes the likelihood that the parent will be wrongfully pressured into accepting partial payment of the full amount due.

In determining that public policy considerations do not require such settlement agreements to be invalidated, the dissenting opinion also distinguishes between future child support payments, which are obligations owed to the child, and past due child support payments, which are owed to the custodial parent. The dissent characterizes past due child support as an obligation belonging *solely* to the custodial parent, viewing the payment of past due support as nothing more than a reimbursement for amounts already expended for the support of the child.

The characterization of past due child support as a mere reimbursement for amounts already expended oversimplifies the true situation. The function of child support is to help a custodial parent maintain an adequate standard of living for the child. When child support payments are not made, the result is a loss of funds available for the child's food, clothing, education, and home environment. It is a strong, long-standing policy of this state to protect the interests of its children, and this is the policy underlying the enforcement of child support obligations. Characterizing arrearages as nothing more than a "debt" owed to the custodial parent ignores the reality that the child is frequently the one who has been harmed by nonpayment and it is the child's interests which are ultimately sought to be protected. The payment of arrearages compensates for the wrong to the child at least as much as it reimburses the custodial parent for monies spent on the child. Although the extent to which a child presently benefits from the payment of arrearages varies from case to case, past due child support is still more properly characterized as an unfulfilled duty to the child than a "debt" to the custodial parent. *See Adair v. Martin*, 595 S.W.2d 513 (Tex.1980) (stating that unpaid child support is not characterized as a debt, even though it can be reduced to judgment and enforced in the same manner as a debt).

The dissenting opinion cites several decisions from other jurisdictions which distinguish between agreements regarding future child support payments and those regarding arrearages. However, some recent decisions do *not* allow parents to contractually modify the amount of arrearages without court approval. *See, e.g., McCool v. State ex. rel. State of Tenn.*, 560 So.2d 772, 774 (Ala.Civ.App.1990) (holding that agreements to waive child support arrearages are a "nullity," noting that it is "well settled" in Alabama that parents cannot nullify a child support court order by mutual agreement); *Goodpasture v. Goodpasture*, 7 Va.App. 55, 371 S.E.2d 845, 847 (1988) (holding that past due support installments become vested as they accrue and are immune from change, and parties cannot by contract, acquiescence, or waiver modify the terms of a support order without court approval).

The dissenting opinion incorporates the remarks of one commentator who, when reporting on the court of appeals decision, refers to this case as "silly." This court does not view any case involving the protection of a child's best interest as "silly." Considering the comprehensive provisions of the Family Code intended to protect the children of this state, the legislature did not take this matter lightly. The dissent implies that a situation in which a non-

custodial parent has failed to pay child support for over eight years should be treated with levity. The best interest of the children of Texas is now and always will be treated by the courts of this state as a matter of the greatest importance.

■ Requiring that the trial court reduce arrearages to a final judgment before such agreements can be entered into protects the interests of the child by encouraging the payment of child support and protects the interests of the custodial parent by equalizing the bargaining positions of the parties. For these reasons, we affirm the judgment of the court of appeals.

DOGGETT, J., concurs, joined by MAUZY, J.

CORNYN, J., concurs.

PHILLIPS, C.J., dissents, joined by GONZALEZ and HECHT, JJ.

DOGGETT, Justice, concurring.

I concur in the court's judgment and opinion, but write separately because of a dual concern—the need for greater clarity in the underlying rationale for the court's action and the unnecessary reference in Justice Cornyn's opinion to a troubling doctrine that could inspire considerable future mischief.

Justice Cornyn would invalidate the contract at issue in large measure because it conflicts with "a principle of natural law" and the "moral" duty of parents to support their children. Opinion at 149. He relies upon *Gully v. Gully*, 111 Tex. 233, 231 S.W. 97 (Tex.1921), a case which does indeed note the natural and moral responsibility of the father to support his children, due to the "natural differences between the sexes" and his legal position as "the head of his family." 231 S.W. at 99, 98.

Natural law stems not from any mandate of the citizens of this State, nor from any enacted law or ratified constitution. Instead, this set of principles for the guidance of human conduct arises from divine or natural inspiration. In recent times this doctrine has been resuscitated by those eager for judicial imposition of a national moral code. Some have unwisely suggested that natural law would justify invalidation of environmental regulation,[1] while others have relied on it in an effort to infringe upon a woman's fundamental right to privacy by wrongfully asserting that natural law prohibits abortion under all circumstances.[2]

While agreeing fully with Justice Cornyn that parents have a natural and moral obligation to support their children, I would not embrace the archaic dicta of *Gully*. Generally I prefer to leave the development of moral codes to individuals and families as well as to religious and other institutions. The unnatural injection of natural law into today's decision can only serve to encourage those who are insistent in demanding that this court force the moral values of a few upon the rest of society.

The philosophy of the dissent, on the other hand, seems more consistent with the view of law and economics advocate Richard Epstein who contends that contract

> rules do not refer to flesh-and-blood individuals, but to those lifeless abstractions, A and B, about whom nothing else is known or—more to the point—is relevant. * * * [T]he identities of the contracting parties and the terms on which they contract are of no special concern to the state.... [3]

---

1. James L. Huffman, *A Fish Out of Water: The Public Trust Doctrine in a Constitutional Democracy*, 19 Envtl.L. 527 (1989); James L. Huffman, *Avoiding the Takings Clause Through the Myth of Public Rights*, 3 J. Land Use & Envtl.L. 171 (1987). *See generally* Roderick F. Nash, The Rights of Nature: A History of Environmental Ethics 87–120 (1989).

2. Charles E. Rice, *Issues Raised by the Abortion Rescue Movement*, 16 Suffolk U.L.Rev. 15, 29–40 (1989); H.C. Ghent, *Criminal Abortion, or Foeticide*, 20 Transactions of the Tex. State Med. Ass'n 119–20 (1888), *discussed in* Amy Johnson, *Abortion, Personhood, and Privacy in Texas*, 68 Tex.L.Rev. 1521, 1526–27 (1990).

3. Richard A. Epstein, *A Common Law for Labor Relations: A Critique of the New Deal Labor Legislation*, 92 Yale L.J. 1357, 1364–66 (1983).

Under this lifeless and sterile concept of contract it is also unnecessary to distinguish between human beings and commodities,[4] whether grains of wheat or dollar bills. Epstein argues further that private agreements should never be set aside on the basis of public policy or unconscionability; rather, all contracts for legal activities must be enforced except those made by incompetent parties and those procured by fraud. The ultimate public policy, according to Epstein, is that "men ... shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by the Courts...."[5]

With a similar rigid view of contract doctrine, the dissent relies on the principle of accord and satisfaction to treat the mother and father involved as merely Creditor A versus Debtor B. To analyze the agreement concerning parental support of their daughter in this fashion disserves them as well as the larger public interest. Here we must look beyond the four corners of the contract to consider its subject matter, the identity of the parties, and the surrounding circumstances.[6]

Contracts affecting children have long been subject to heightened judicial scrutiny and the application of public policy analysis. This is particularly true with regard to adoption agreements [7] and exculpatory contracts,[8] and extends to child support agreements as well.[9] Because a child is not property but an individual with dignity and humanity, a court should refuse to enforce contracts that are not in the child's best interest. *See United States v. King*, 840 F.2d 1276 (6th Cir.1988) (parental consent to tortious treatment of child void as against public policy).

The law of Texas does not require an inflexible, impersonal view of contracts. Contract is basically a theory of human obligations that must at times be adjusted to reflect the society in which agreements are entered. From early times, courts have refused to enforce certain contracts deemed to be against public policy.[10] Oliver Wendell Holmes wrote long ago that there are circumstances in the interpretation of contracts where public policy, the interests of people other than the parties to the contract, must be considered. *Beasley v. Texas & Pacific Ry. Co.*, 191 U.S. 492, 24 S.Ct. 164, 48 L.Ed. 274 (1903). On a num-

---

4. Taken to an extreme, this view would permit a free market in baby-selling. *See* Elizabeth Landes and Richard A. Posner, *The Economics of the Baby Shortage*, 7 J.Leg.Stud. 323, 328 (1978).

5. Richard A. Epstein, *Unconscionability: A Critical Reappraisal*, 18 J.L. & Econ. 293 (1973) (quoting *Printing and Numerical Registering Co. v. Sampson L. R.*, 19 Eq. 462, 465 (1875)).

6. Accord and satisfaction is not applicable when one party has a fiduciary duty to another party involved in the contract. People in certain relationships must act in good faith and avoid self-dealing which places personal interest in conflict with obligations to intended beneficiaries. *See Trevino v. Brookhill Capital Resources*, 782 S.W.2d 279 (Tex.App.—Houston [1st Dist.] 1989, writ denied) (citing *Slay v. Burnett Trust*, 143 Tex. 621, 639–640, 187 S.W.2d 377, 387–388 (1945)). *See also* Restatement (Second) of Contracts § 193 (1979) (promise inducing violation of fiduciary duty unenforceable as against public policy). Parents stand in a fiduciary relationship with their minor child which supersedes a defense of accord and satisfaction.

7. *Ford v. Ford*, 371 U.S. 187, 193, 83 S.Ct. 273, 277, 9 L.Ed.2d 240 (1962) (declining to enforce child custody contract); *Knight v. Deavers*, 531

S.W.2d 252 (Ark.1976) (denying specific performance of foster parent contract determined not to be in the child's best interest).

8. Judicial treatment of exculpatory contracts which affect children is most illuminating since "business" arrangements are clearly at work, yet contract doctrine fluidly encompasses the child's best interests. Parental releases of a minor's potential claims as a condition to participation in group outings, for example, are outrightly disfavored. *See, e.g., Fitzgerald v. Newark Morning Ledger Co.*, 111 N.J.Super. 104, 267 A.2d 557 (1970); *Fedor v. Mauwehu Council, Boy Scouts of America, Inc.*, 21 Conn.Supp. 38, 143 A.2d 466, 468 (Conn.Super.Ct.1958).

9. *Houtchens v. Matthews*, 557 S.W.2d 581, 585 (Tex.Civ.App.—Ft. Worth 1977, writ dism'd) (public policy supports extended statute of limitations for collection of overdue child support payments). *See also* Restatement (Second) of Contracts § 190, comment a (1979) (noting public interest in contracts involving child support).

10. Walter Gellhorn, *Contracts and Public Policy*, 35 Colum.L.Rev. 679 (1935).

ber of recent occasions, our Texas judiciary has refused to enforce various contractual obligations that conflicted with public policy in this state.[11] Substantial societal concerns may be reflected in statutes, state and federal constitutions, judicial decisions, administrative decisions, rules and regulations, or other statements of public policy.[12]

The Court's holding that the contract is unenforceable need not be based on mysticism. The proper basis for today's decision is found in the well-established law of contracts unenforceable as against public policy. The particular public policy interest is reflected in statutes and case law cited by the court, 821 S.W.2d 145, and in article 16, section 28, of our Texas Constitution, all of which emphasize the paramount concern of our citizens with promoting the best interests of the child. Unlike natural law justifications, public policy analysis reflects stated societal concerns, not individual judicial inspiration.

MAUZY, J., joins in this concurring opinion.

CORNYN, Justice, concurring.

Although I emphatically agree with the majority opinion, I write separately to stress the sound common law reasons and legislative policies supporting the court's judgment. Further, I want to express my grave concern with any judicial condonation, which I perceive is implicit in the dissent's opinion, of an end run around the district court's fundamental responsibility to protect the best interest of the child in each child support dispute.

The obligation to support one's child is not, legally or morally, just another creditor-debtor relationship. Nor is it simply a matter to be negotiated between ex-spouses. It is for the benefit of the child, whose right to adequate financial support from *both* parents is too often overlooked in the hostilities associated with divorce and its aftermath. Unfortunately, approval of the extra-judicial settlement of child support arrearages here, as the dissent would hold, would serve as an *incentive* for obligors *to resist payment of their child support* in the hope that they can effectively extort an out-of-court agreement from an obligee left with no real alternative other than to settle for pennies on the dollar. Ms. Patton, having borne the financial obligations of parenthood alone while Mr. Williams accrued child support arrearages of $9,885, can only be described as doing so under economic duress. Presuming, as we must, that the original child support order was appropriate and that Mr. Williams was able to make periodic payments for child support at the time they were ordered, it is nevertheless no surprise that after eight years of non-payment, he is unable to pay the arrearages in a lump sum. The logical consequence of the dissent's opinion would be a reward for Mr. Williams' contemptible behavior. Thus he, and others like him, would actually have a financial *disincentive* to pay periodic support. Indeed, strictly on financial grounds, why would an obligor pay child support as ordered by the court when he could settle eight years later for a fraction of the amount? Our

**11.** Cases invalidating contracts on the basis of public policy include: *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660 (Tex. 1990) (unreasonable covenant not to compete); *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705 (Tex.1987) (exculpatory contract not expressly requiring indemnification from own negligence); *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733 (Tex.1985) (improper termination of employment-at-will contract); *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936 (Tex.1984) (policy allowing insurer to avoid liability for plane crash due to insured's unrelated technical breach); *Unigard Sec. Ins. Co. v. Schaefer*, 572 S.W.2d 303 (Tex.1978) (insurance contract excluding personal injury coverage); *Crowell v. Housing Auth. of Dallas*, 495 S.W.2d 887 (Tex.

1973) (lease provision exempting landlord from tort liability to tenants); *Smith v. Golden Triangle Raceway*, 708 S.W.2d 574 (Tex.App.—Beaumont 1986, no writ) (release from liability for gross negligence); *Lone Star Gas Co. v. Veal*, 378 S.W.2d 89 (Tex.Civ.App.—Eastland 1964, writ ref'd n.r.e.) (contract exempting gas company from liability for own negligence). *See also Winters v. Houston Chronicle Publishing Co.*, 795 S.W.2d 723, 725 (Tex.1990) (Doggett, J., concurring) (survey of public policy restrictions on employment contracts).

**12.** *Winters v. Houston Chronicle Publishing Co.*, 795 S.W.2d 723, 732 (Tex.1990) (Doggett, J., concurring).

state's—indeed, our nation's—public policy demands the timely payment in full of all court-ordered child support. The responsibility to see that policy realized falls unmistakably on the judiciary.

By treating the child support obligation as just another commercial obligation, the dissent overlooks the historically unique legal, societal, and moral nature of the parental support obligation. The failure of too many parents to meet their child support obligations has appropriately been called a national disgrace. *See, e.g.,* Woods, *Child Support: A National Disgrace,* Special Child Support Issue, FAM. L.SEC.REP. (1984). The number of children living in single parent homes in this country has exploded over recent years. In 1970, 11.9 percent of the 69.2 million children in this nation lived in households headed by single parents. In 1988, that number rose to 25 percent of 61.3 million children, even though all but 1 million had two living parents.[1] In 1989, this state's population included 1,147,000 children between 0 and 17 years of age entitled to support payments. Only 24.3 percent of these children received regular child support payments in full; in other words, 75.7 percent of these children received either no child support, or less than that to which they were entitled under a court order. *See* TEXAS DEPARTMENT OF HUMAN SERVICES, 1989 SPECIAL TEXAS CENSUS. But for the common knowledge of the enormity of the child support crisis, the lack of compliance with court ordered child support would be in the headlines of every newspaper in this country.

This court has long recognized the "natural and legal duty" of both parents to support their children during minority. *Gully v. Gully,* 111 Tex. 233, 231 S.W. 97, 98 (Tex.1921).[2] Blackstone first articulated the child support obligation as a principle of natural law.[3] The origins of the common law duty of support can be traced to Chancellor Kent, who conceived what later came to be known as the American rule providing that a parent is absolutely bound to provide support and can thus be sued for the provision of necessaries.[4]

The authority—indeed, the duty—of the courts to supervise the enforcement of the child support obligation cannot be seriously questioned. This common law heritage can be traced to the power of the sovereign to protect those under legal disability, such as minor children. The state's interest in this area is often referred to as *parens patriae,* which literally means "parent of the country" and refers to the power of the state to serve as guardians over persons with a legal disability, such as minors or incompetents. *West Virginia v. Chas. Phizer & Co.,* 440 F.2d 1079, 1089 (2d Cir.1971), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *see also* Mnookin & Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce,* 88 YALE L.J. 950, 954–55 (1979). Early English historians noted "that the king should protect all who have no other protector, that he is the guardian above all guardians, is an idea which has become exceptionally prominent in this much governed country."[5] This power was soon delegated to the Court of Chancery, which became responsible for appointing guardians, providing adequate maintenance, and awarding custody. "For the lord chancellor is, by right derived from the crown, the general and supreme guardi-

---

1. CONGRESSIONAL RESEARCH SERVICE, THE CHILD SUPPORT ENFORCEMENT PROGRAM: POLICY AND PRACTICE 1 (1989) (prepared for the subcommittee on Human Resources, Committee on Ways and Means).

2. Justice *Doggett's* concurrence worries about the mischievous implications of the words "natural" and "moral," used by this court in 1921 when describing the duty of *both* parents to financially support their children. In his curious effort to distance himself from such notions, he overlooks the fact that *Gully* is cited primarily for the purpose of tracing the com-

mon law heritage of this duty from antiquity to modern times.

3. 1 W. BLACKSTONE, COMMENTARIES ON THE LAW OF ENGLAND *435 [hereinafter 1 Blackstone].

4. Schuele, *Origins and Development of the Law of Parental Child Support,* 27 J.FAM.L. 810 (1988–89).

5. 2 F. POLLOCK & F. MAITLAND, THE HISTORY OF ENGLISH LAW 443 (reprinted 1968).

an of all infants...." [6] When we adopted the common law of England and abolished the English division between law and equity courts in this state, the obligations of the chancellor devolved on the Texas judiciary. In fact, in 1950 this court first promulgated a rule of civil procedure to enable and encourage the district courts to initiate enforcement proceedings when it learns that its child support orders have not been complied with. *See* TEX.R.CIV.P. 308. Indeed, a recent joint project of the National Center for State Courts, and the Bureau of Justice Assistance, United States Department of Justice, emphasizes the trial court's responsibility for the enforcement of its own orders. Significantly, the report cites child support orders as one example. NATIONAL CENTER FOR STATE COURTS & THE BUREAU OF JUSTICE ASSISTANCE, UNITED STATES DEPT. OF JUSTICE, TRIAL COURT PERFORMANCE STANDARDS, Standard 3.5 (1990). Failing to enforce lawful court orders undermines the rule of law, and diminishes the public's trust and confidence in the courts. *Id.*

However, it was not until the legislature became involved in imposing child support obligations that the notion of legal duty became firmly entrenched.[7] At first, matters of child support were dealt with under the state's divorce laws. Most often the issue of support was only considered as relevant in determining how the community estate was to be divided. For example, the Texas statute, enacted in 1841, stated that "the court pronouncing a decree of divorce ... shall also decree and order a division of the estate of the parties in such way as to them shall seem just and right, having due regard to the rights of each party and their children...." [8] Thus the property settle-ment resulting from the divorce was considered to provide for the future needs of the children. Periodic payments were not an option at the time because the courts were deemed to have no power to order such payments without the obligor's consent.[9] The change in focus to the best interest of the child came about only as society came to realize that the welfare of the child should be the paramount consideration in the formulation and enforcement of child support obligations.

Lord Mansfield first articulated the "best interest of the child" standard in *Blisset's Case*, 98 Eng.Rep. 899, 899 (K.B.1774), a child custody case. However, the standard did not evolve to include considerations of child support until later.[10] Courts often filled this void by intertwining the issues of custody and child support in a way that the child would be placed with the parent better able to support him. To accomplish this, the courts often employed a financially-based standard to determine issues of custody and support. For example, a 1935 Texas statute provided:

"[the] Court shall have full power and authority to inquire into and ascertain the financial circumstances of the parents of such child or children, and of their ability to contribute to the support of same, and such court shall make such orders regarding the custody and support of each such child or children, as is for the best interest of the same ..." (emphasis added).[11]

Today, this standard is found in § 14.07(a) of the Texas Family Code which provides, in part: "The best interest of the child shall always be the primary consideration of the court in determining questions

6. 1 BLACKSTONE at *451.

7. *Schuele, supra* note 4, at 825.

8. Act approved Jan. 6, 1841, 5th Cong., R.S. § 4, 1841 Republic of Texas Laws 20, 2 H. GAMMEL, LAWS OF TEXAS 483, 484 (1838–1846) (current version at TEX.FAM.CODE § 3.63).

9. *See Martin v. Martin,* 148 S.W. 344, 345 (Tex. Civ.App.—El Paso 1912); *Bond v. Bond,* 41 Tex.

Civ.App. 129, 90 S.W. 1128, 1128 (Tex.Civ.App.— Fort Worth 1905); *Ligon v. Ligon,* 39 Tex.Civ. App. 392, 87 S.W. 838, 839 (Tex.Civ.App.—San Antonio 1905).

10. *Schuele, supra* note 4, at 818.

11. Act of March 19, 1935, 44th Leg., R.S., ch. 39, § 1, 1935 TEX.GEN.LAWS 111, 112, (current version at TEX.FAM.CODE § 11.05, 14.03, 14.-05(a), 14.08(a)).

[regarding] ... support of ... the child." [12]

The dissent also fails to consider the impact its approach would have on the recipients of federal child support subsidies. The federal government waded into the child support swamp in 1974 with the passage of Title IV–D of the Social Security Act, 42 U.S.C. §§ 651–65 (1988). Congress's initial goal was to staunch the hemorrhage of welfare payments made through the Aid to Families With Dependent Children (AFDC) program to primarily poor female heads of household and their children receiving either no, or inadequate, child support from their fathers. As the benefits of federal support enforcement became apparent, the IV–D program has expanded and become available in non-welfare cases too. Texas law requires recipients of AFDC, in return, to assign their rights to uncollected child support to the state and actively cooperate in the enforcement of the obligor's child support duty. TEX.FAM.CODE § 14.062.[13] The dissent fails to take into account the potentially disruptive impact on the federal and state statutory scheme when the child support obligee is an AFDC recipient, and yet, for whatever reason, attempts to privately settle child support arrearages without court supervision.

Approval of extra-judicial settlement of child support arrearages would also render toothless federal efforts to improve child support enforcement begun in 1984 when Congress, using the carrot and stick approach, mandated that the states enact a number of specific remedies and procedures as a condition for the receipt of federal funds. *See* HOROWITZ, DODSON & HAYNES, REMEDIES UNDER THE CHILD SUPPORT ENFORCEMENT AMENDMENTS OF 1984 (1985) (prepared for U.S. Department of Health and Human Services, Office of Child Support Enforcement). One prescribed procedure required the establishment of discretionary guidelines for courts in setting child support. Child Support Enforcement Amendments of 1984, Pub.L. No. 98–378, § 18, 98 STAT. 1305, 1321–22 (codified as amended at 42 U.S.C. § 667 (1988)). In 1985, the Texas legislature responded by amending Family Code section 14.05(a) to require that this court promulgate child support guidelines for the state's trial courts. One stated purpose of the guidelines was to "promote the well-being of children through the timely fulfillment of parents' obligation to support their children." Act of June 3, 1985, 69th Leg., R.S., ch. 232, 1985 TEX.GEN. LAWS 1158, 1158. In 1989, the guidelines promulgated by this court were superseded by legislative guidelines. TEX.FAM.CODE § 14.052. Obviously, child support guidelines for the courts are of little use were this court to condone parental agreements effecting the support obligation without court approval.

In 1986, Congress passed further amendments to Title IV–D of the Social Security Act requiring, as a condition to the receipt of federal monies, the amendment of state law to provide that support installments become vested as they come due. 42 U.S.C. § 666(a)(9) (1988). Rather than being intended to limit the power of the trial court to meaningfully supervise child support orders, as the dissent supposes, Congress in fact sought to prevent retroactive modification of arrearages and to facilitate the enforcement of overdue child support payments by giving overdue payments the status of a judgment entitled to full faith and credit in other states. Congress's goal appears to have been three-fold: to aid in

---

**12.** For cases applying § 14.07 to child support, see *Walton v. Walton,* 567 S.W.2d 66, 68 (Tex. App.—Amarillo 1978, no writ); *Friedman v. Friedman,* 521 S.W.2d 111, 115 (Tex.App.— Houston [14th Dist.] 1975, no writ).

**13.** § 14.062 reads as follows:
Reimbursement for Public Assistance.
(a) The court may order either or both parents to make periodic payments or a lump sum payment as child support, or both, as reimbursement for public assistance paid by the state for the support of a child under Chapter 31, Human Resources Code.
(b) Unless the state is a party to an agreement concerning support or purporting to settle past, present, or future support obligations by prepayment or otherwise, an agreement between the parties does not reduce or terminate any right of this state or any other state to recover for public assistance provided.

the interstate enforcement of child support orders, to encourage timely requests for modification based on changed circumstances, and to discourage the type of self-help in which the obligor and obligee have indulged here.

Moreover, the self-help attempted by the parties in this case does not eliminate or reduce court intervention, as the dissent suggests; experience shows that it merely *postpones* it. After not paying child support for eight years, is it likely that the obligor will have greater fidelity to his settlement agreement than he had to the child support order of a district court? Common sense tells us the answer is no. Rather than a single hearing before the trial court, the putative settlement has now resulted in a trial on the merits, an appeal to the court of appeals and the proceedings before this court. The course suggested by the dissent does not even have expediency with which to commend itself.

For the forgoing reasons, I join the majority in holding the purported settlement of child support arrearages void and unenforceable, and thus affirm the judgment of the Court of Appeals.

PHILLIPS, Chief Justice, dissenting.

I respectfully dissent. The court's holding imposes upon divorced parents wishing to compromise arrearages in child support a time-consuming and expensive procedure, with little or no corresponding benefit to themselves, their offspring or society. Today's ruling, despite the lofty rhetoric accompanying it, is but another example of judicially imposed make-work for the bench and bar.

The issue for our determination is whether the law which *permits* a custodial parent to obtain an automatic judgment for past due child support also *prohibits* the parents from making their own compromise bargain when support is past due. I find nothing in either the language of the statute or the public policy underlying it to support the court's affirmative answer to that question.

For many years, a custodial parent's only remedy for nonpayment of child support obligations was an action for contempt. *See Huff v. Huff*, 648 S.W.2d 286, 287 (Tex.1983). Beginning in 1973, Section 14.41 and its statutory predecessor gave custodial parents a valuable second remedy, the ability to obtain a money judgment for the amount of arrearage, enforceable by "any means available for the enforcement of judgments for debts." *See Huff*, 648 S.W.2d at 287–88; *Ex parte Payne*, 598 S.W.2d 312, 319 (Tex.Civ.App.—Texarkana 1980, no writ); *Houtchens v. Matthews*, 557 S.W.2d 581, 584 (Tex.Civ.App.—Fort Worth 1977, writ dism'd).[1] Today we must determine the full import of this statutory right.

All parties concede that the statute neither expressly allows nor prohibits a compromise settlement of past due child support. To conclude that the custodial parent must reduce all outstanding obligations to judgment before effecting settlement, the

1. The original act was former Texas Family Code section 14.09(c). *See* Act of May 24, 1973, 63rd Leg., R.S., ch. 543, § 1, 1973 Tex.Gen.Laws 1411, 1426. This section provided:

On the motion of any party entitled to receive payments for the benefit of a child, the court may enter judgment against a defaulting party for any amount unpaid and owing.... The judgment may be enforced by any means available for the enforcement of judgments for debts.

This section was repealed in 1985, *see* Act of May 27, 1985, 69th Leg., R.S., ch. 232, § 14, 1985 Tex.Gen.Laws 1158, 1170, and replaced by new section 14.41(a), *see id.* § 9, 1985 Tex.Gen. Laws at 1163, which provided:

Judgment for Arrearage. On the motion of an obligee, after notice and hearing, the court shall render judgment against an obligor for any amount of child support unpaid and owing. The judgment may be enforced by any means available for the enforcement of judgments for debts.

Section 14.41(a) was amended to its current form in 1986. *See* Child Support Enforcement Act of 1986, 69th Leg., 2nd C.S., ch. 10, § 6, 1986 Tex.Gen.Laws 15, 17 (eff. Jan. 1, 1987). The purpose of the new first sentence, "[a] periodic child support payment not timely made shall constitute a final judgment for the amount due and owing," is to provide a legal basis for the issuance of a writ of income withholding as provided in Family Code sections 14.44, 14.45. House Comm. on Judiciary, Bill Analysis, Tex. S.B. 26, 69th Leg., 2nd C.S. 3 (1986).

various opinions rely heavily on the unique role of judicial supervision in family law cases. They emphasize that the trial court must exercise "independent judgment" and "closely supervise" child support proceedings to ensure that the child's best interest is protected.

As a general proposition, this is undoubtedly true; but it is quite irrelevant to the case at hand. Unlike those provisions of the Family Code on which the majority relies, section 14.41 leaves nothing to the trial court's independent judgment or supervisory discretion. Under its provisions, the trial court has no independent authority to reduce or modify the amount of child support arrearage. Tex.Fam.Code § 14.-41(d). In fact, the court is directed merely to "confirm" the amount due. *Id.* § 14.-41(a). The judgment is subject to an offset or counterclaim only after it is rendered. *Id.* Obviously, there is nothing for the court to judge or supervise; the judge here acts as a mere scrivener.

Moreover, the court concedes that once the trial court has mechanically reduced the past arrearage to judgment, the parents are totally free to settle, compromise or entirely forgive that judgment as they see fit. Thus the court does not deny to parties who want to settle the right to do so; it merely requires them to spend additional legal fees, wait more time, and waste valuable judicial resources in the process. The court justifies this exercise as giving the custodial spouse "additional remedies," thus placing him or her "on more equal footing with the obligor" when negotiating a settlement. But those rights are available anyway; the provisions of section 14.41 are automatic to those who wish to use them.

No public policy considerations support the court's strained position. Unlike future child support payments, which are obligations of the noncustodial parent *to the child,* past due child support payments are owed *to the custodial parent* as reimbursement for the amounts which have necessarily already been expended for the support of the child. *See Maxwell v. Maxwell,* 204 S.W.2d 32, 36, 38 (Tex.Civ.App.—Amarillo 1947, writ ref'd n.r.e.) (an action to recover amount expended by wife to support child is treated as an ordinary action for debt). Thus, the custodial parent should have the freedom to settle, release, or waive his or her right to collect this obligation which belongs solely to him or her.[2]

Most other jurisdictions have drawn a similar distinction between agreements regarding future child support payments and those regarding arrearage. *See Lindsey v. Lindsey,* 6 Haw.App. 201, 206, 716 P.2d 496, 500 (1986); *Andersen v. Andersen,* 89 Idaho 551, 557–58, 407 P.2d 304, 307–08 (1965); *Rodgers v. Rodgers,* 505 S.W.2d 138, 144 (Mo.Ct.App.1974); *Cervantes v. Cervantes,* 239 Mo.App. 932, 937–38, 203 S.W.2d 143, 146–47 (1947); *Brannock v. Brannock,* 104 N.M. 385, 386, 722 P.2d 636, 637 (1986); *Kissinger v. Kissinger,* 692 P.2d 71, 74 (Okla.App.1984); *Miller v. Miller,* 29 Or.App. 723, 727–28, 565 P.2d 382, 385 (1977); *Hartman v. Smith,* 100 Wash.2d 766, 768, 674 P.2d 176, 178 (1984); *see also McCormick v. Collard,* 105 Ind. App. 92, 96, 10 N.E.2d 742, 743 (1937) (en banc) (accrued unpaid child support constitutes a debt owed by obligor to person who supported and maintained child during that period); *cf. Linton v. Linton,* 166 Ind.App. 409, 422, 336 N.E.2d 687, 695 (1975); *Larsen v. Larsen,* 5 Utah 2d 224, 227, 300 P.2d 596, 598 (1956). Only *Goodpasture v.*

---

2. The court cites *Adair v. Martin,* 595 S.W.2d 513, 515 (Tex.1980), for the proposition that past due child support "is still more properly characterized as an unfulfilled duty to the child than a 'debt' to the custodial parent." 821 S.W.2d 145. Although we did state that child support arrearage are not characterized as a debt prior to their reduction to judgment, we went on to hold that such arrearage could be reduced to judgment after the death of a parent, which judgment would then constitute a "claim" against the de-

ceased parent's estate. *Id.* Such a claim would be payable out of the estate just as any other "debt" that accrued prior to the decedent's death. (The Probate Code now expressly provides for the payment of child support arrearage out of the deceased's estate. *See* Tex.Prob.Code § 37.) This holding suggests that child support arrearage, while not formally "debts," in most cases may be treated in the same way debts are treated.

*Goodpasture,* 7 Va.App. 55, 371 S.E.2d 845 (1988), appears to hold to the contrary. In the other intermediate appellate authority upon which the majority relies, *McCool v. State ex rel. State of Tenn.,* 560 So.2d 772, 774 (Ala.Civ.App.1990), the court stated that agreements to waive child support arrearage are a nullity, but then held the parties bound by their stipulation to a lesser amount. Thus the actual holding of that case, if not its language, is contrary to our holding today.

The agreement reached by these parties was an accord and satisfaction. An accord is a contract in which parties agree to discharge an existing obligation by means of a lesser payment; satisfaction is the execution of such agreement. *Texas & P. Ry. Co. v. Poe,* 131 Tex. 337, 340, 115 S.W.2d 591, 592 (1938); 1 Tex.Jur.3d *Accord and Satisfaction* § 1 (1979); *see also Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969). Evaluating the validity of the settlement and release agreement under general principles applicable to such agreements, I would hold it to be valid. Williams's agreement to pay dramatically increased child support in the future was in my opinion sufficient consideration for Patton's compromise of his past due obligations. While not technically binding on the trial court, a husband's promise not to oppose a near trebling of monthly child support is virtually certain to meet with judicial favor. Williams's agreement to forebear from defending a suit is therefore adequate consideration to support a contract. *See Restatement (Second) of Contracts* §§ 71, 74 (1981); 1 *S. Williston, Williston on Contracts* § 135B at 585–86 (W. Jaeger ed., 3d ed. 1957); *cf. Leonard v. Texaco, Inc.,* 422 S.W.2d 160, 165 (Tex. 1967) (forbearance from bringing suit constitutes adequate consideration).

In reporting on the court of appeals opinion in this case, one commentator acidly noted:

> Isn't this case silly? Rather than the obligor saying "I'll pay you 50% of the back child support and I'm released," he now says "I agree to a judgment for 100%, and after the judgment is signed I'll pay you 50% and the 100% judgment

is released." All the court did was add the time and expense of drawing an agreed judgment for the accrued child support.

D. Gray, *Comment,* 91–1 *St. B. of Tex. Fam.L.Sec.Rep.* 27 (1991).

Because I agree with these observations, I dissent.

GONZALEZ and HECHT, JJ., join in this dissenting opinion.