TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00453-CV






South Texas College of Law and Texas A&M University, Appellants



v.



Texas Higher Education Coordinating Board, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. 98-03828-A, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING






 Appellants South Texas College of Law ("South Texas") and Texas A&M
University ("A&M") appeal from a summary judgment declaring their Affiliation Agreement void
and enjoining them from acting, or purporting to act, under the Agreement. We will affirm the
trial court's judgment.


BACKGROUND


 On January 23, 1998, appellants entered into an "Agreement for Exclusive
Affiliation between South Texas College of Law and Texas A&M University" ("Affiliation
Agreement" or "Agreement"). The Agreement's preamble states that A&M is a public institution
of higher education "offering courses of study and degrees in a broad range of undergraduate
academic pursuits, but with no specialized curriculum for the teaching of law and granting of
degrees in that field." South Texas is a free-standing, private institution offering only law
degrees. According to the Agreement, A&M "believes that an exclusive affiliation with [South
Texas] would further [A&M's] goals and missions by broadening its coverage of the academic
disciplines and by providing a means for interdisciplinary study programs." Finally, the
Agreement notes that the Education Code "provides that the Texas Higher Education Coordinating
Board shall consider, enlist and encourage cooperation and cooperative undertakings between
public and private institutions of higher education" and recites A&M and South Texas's belief that
the affiliation will promote the best interests of each institution and "will promote the best
interests of higher education in the State of Texas through the strategic utilization of public sector
assets, talents and goals."

 The substantive portion of the Agreement provides:


( 1) South Texas has limited use of the A&M name and logo, subject to certain
restrictions.


( 2) The Affiliation will not (a) change the private independent status of South
Texas, (b) merge South Texas into A&M, (c) entitle South Texas to public
funds or property to which it was otherwise not entitled, or (d) restrict the
authority of South Texas's board of directors. 


( 3) Both parties will cooperate in obtaining all necessary approvals.


( 4) A&M will control six of the nineteen seats on South Texas's board of
directors and two of the six seats on the board's executive committee and
have power to appoint a member of South Texas's admissions committee. 
A&M will also be entitled to receive prior written notice and an opportunity
to comment on nomination and election of South Texas's board of directors.


( 5) South Texas through its board, president, dean, and faculty will remain
responsible for all management, operating, financial, academic, admissions,
and faculty decisions. But A&M's provost will be given written notice and
an opportunity to comment on full-time faculty appointments.


( 6) A&M's provost will be entitled to make comments and express concerns to
South Texas's dean and president regarding all tenure candidates who are
hired after the effective date of the Agreement before the dean and president
can make recommendations to the board.


( 7) A&M and South Texas will each appoint an equal number of persons to an
operating committee that will meet at least twice a year "to discuss matters
of mutual interest to such affiliated institutions including without limitation
joint degrees, combined degrees, certification programs and foreign
programs."


( 8) A&M and South Texas will each appoint an equal number of persons to an
affiliation committee that will meet as needed to "discuss all areas of
prospective sharing between the affiliated institutions, including without
limitation: technology, libraries, development and joint and combined degree
plans."


( 9) Following an initial twenty-year term, either party may end the affiliation
three years after giving written notice.


(10) South Texas will provide A&M with access to audited financial statements.


(11) A&M promises to use its best efforts to convince the A&M former students'
association to allow South Texas's former and future graduates to become
members.


(12) A&M promises to use its best efforts to convince A&M's University
Foundation to assist and coordinate with South Texas's development office
in fund-raising and similar projects. South Texas agrees that its development
office will cooperate.


(13) A&M agrees to coordinate its public relations activities with South Texas.


(14) A&M agrees to give South Texas office space and personnel for a
coordinating office on the A&M campus. South Texas agrees to make
similar arrangements if A&M requests them.


(15) A&M's president will have the opportunity to evaluate South Texas's
president and dean annually and report the results to South Texas's board.


(16) A&M's president will have the chance to make suggestions and express
concerns regarding finalists for the positions of South Texas's president and
dean.


(17) South Texas agrees to amend its articles of incorporation and bylaws to
reflect the affiliation. 


(18) A&M agrees to consider requests by South Texas's president, dean, and
chairman of the board to place items on the agenda of the A&M system's
board of regents.


(19) Both parties agree to "take such action as may be necessary or appropriate
from time to time to foster the effective assimilation of [South Texas]
graduates, students, administration and faculty into all aspects of [A&M's]
culture and affairs."


(20) The parties agree to include each other, and their graduates, students,
administration, and faculty on general mailing lists as appropriate.


(21) A&M and South Texas agree to consult and cooperate regarding South
Texas's accreditation by the American Bar Association, membership in
Association of American Law Schools, and adherence to the Law School
Admission Council's Code of Good Admissions Practices.


(22) In order to ease the transition, South Texas promises to use its best efforts to
retain its current president and dean for five years from the effective date of
the agreement.


(23) All notices and other necessary documents will be provided to designated
representatives of each party.


(24) After five years, either party may give written notice to the other that the
Affiliation "is materially and adversely affecting such party's ability to carry
out any part of its educational mission." The parties will then cooperate for
at least twelve months to remedy the situation. If they are unsuccessful, then
the complaining party may give its three-year written notice of intent to
terminate the affiliation.


(25) A&M and South Texas agree to consider all proposed amendments to the
Agreement in good faith.


(26) The written Affiliation Agreement is integrated and represents all terms of
agreement as between the parties.


(27) The Agreement may be executed via the signing of dual original counterparts.


(28) The Agreement is binding upon the parties and their successors and assigns
but does not provide benefit to any third party.


(29) The Agreement will be construed and enforced under applicable state and
federal laws.



 After appellee Texas Higher Education Coordinating Board ("Coordinating Board"
or "the Board") expressed concern that the Agreement could not be implemented unless and until
the Board approved the addition of law to A&M's role and mission, South Texas filed suit against
the Board in April 1998 seeking, inter alia, declarations that the Agreement did not exceed
A&M's power and that the Board did not have authority to review and approve the Agreement. 
The Board filed a counterclaim, and A&M intervened as plaintiff. Each party filed a motion for
summary judgment regarding the validity of the Agreement. In the motion on its counterclaim,
the Board contended that the Agreement violated the Education Code, the Texas Constitution, and
the state's public policy.

 In its final judgment and order of severance, the district court found "the Affiliation
Agreement to be void because it exceeds the authority granted Texas A&M University in the
Texas Education Code, and because its essential purpose violates public policy as expressed in the
Texas Education Code." The court expressly did not reach the question of whether the
Agreement violated the Texas Constitution. The court awarded the Board permanent injunctive
relief and prohibited A&M and South Texas from acting or purporting to act pursuant to the
Agreement. South Texas and A&M then brought appeal to this Court.


DISCUSSION


 Generally, upon review of a summary judgment, a court determines whether the
movant has shown that no genuine issue of material fact exists and that it is entitled to judgment
as a matter of law. See Tex. R. Civ. P. 166a(c); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d
546, 548 (Tex. 1985). Here, both parties agree this case is appropriately decided by summary
judgment. When both parties move for summary judgment and the trial court grants one motion
and denies the other, the appellate court should determine all questions presented. Commissioners
Court v. Agan, 940 S.W.2d 77, 81 (Tex. 1997); Cornyn v. Universe Life Ins. Co., 988 S.W.2d
376, 378 (Tex. App.--Austin 1999, pet. denied).


Public Policy

 In its summary judgment motion, the Coordinating Board asserted that the
Affiliation Agreement violated the public policy of the State of Texas as expressed in the
Education Code. A court can declare a contract void as against public policy and refuse to
enforce it. Williams v. Patton, 821 S.W.2d 141, 147-48 & n.11 (Tex. 1991) (Doggett, J.,
concurring) (citing numerous cases in which courts found contracts to be void as contrary to
public policy). The State's public policy is expressed through its statutes. National County Mut.
Fire Ins. Co. v. Johnson, 879 S.W.2d 1, 8 (Tex. 1993). Our primary goal in interpreting statutes
is to discern legislative intent, and we do so by looking first to the plain and unambiguous
meaning of the words used. Phillips v. Beaber, 995 S.W.2d 655, 658 (Tex. 1999) (citing Liberty
Mut. Ins. Co. v. Garrison Contractors, Inc., 966 S.W.2d 482, 484 (Tex. 1998); Mitchell Energy
Corp. v. Ashworth, 943 S.W.2d 436, 438 (Tex. 1997); Monsanto Co. v. Cornerstones Mun. Util.
Dist., 865 S.W.2d 937, 939 (Tex. 1993)). We thus look to the plain language of the Education
Code to determine the public policy contained therein.

 Entitled "Purpose," section 61.002 of the Education Code unequivocally states:


The purpose of this chapter is to establish in the field of public higher education
in the State of Texas an agency to provide leadership and coordination for the
Texas higher education system, institutions, and governing boards, to the end that
the State of Texas may achieve excellence for college education of its youth
through the efficient and effective utilization and concentration of all available
resources and the elimination of costly duplication in program offerings, faculties,
and physical plants.



Tex. Educ. Code Ann. § 61.002(a) (West 1996). The Code further states that the Coordinating
Board represents "the highest authority in the state in matters of public higher education." Id.
§ 61.051(a) (West Supp. 2000) (emphasis added). Moreover, the Board is charged with the duty
to take an active part in promoting quality education in the various regions of the state. Id. As
part of that duty, the Coordinating Board is under a responsibility to develop, after consultation
with the governing board of the institution, the role and mission for each public institution of
higher education in Texas. Id. § 61.051(d). A public institution of higher education cannot
change its role or mission without the authorization of the Board; instead, the Board hears
applications from the institutions for changes in role and mission and itself makes changes
necessary to update the role and mission statements of each institution. Id. The Coordinating
Board also has direct control over the initiation or consolidation of degree or certificate programs. 
Id. § 61.051(e). If a program is disapproved by the Coordinating Board, no funds appropriated
to any institution of higher education may be expended for the disapproved program unless the
program is subsequently specifically approved by the legislature. Id. §61.054 (West 1996). 

 The present issue is before us because the Affiliation Agreement implicates the
Board's authority as illustrated in the above provisions. The Agreement's terms, which purport
to enhance and expand A&M's existing programs, coupled with the fact that the Board has
approved neither a law school nor a program in law for Texas A&M, directly infringe upon the
Board's statutory authority in determining whether degree programs are in the best interest of the
state's public institutions and in determining how public resources should be allocated in order
to best serve the educational needs of the state. Absent specific legislative action, the Board alone
has the role of ensuring the efficient and effective utilization and concentration of public assets
available for higher education and eliminating unnecessary duplication. By entering into an
agreement that purports to "promote the best interests of higher education in the State of Texas
through the strategic utilization of public sector and private sector assets, talents and goals,"
appellants usurp the Coordinating Board's singular purpose and frustrate clear legislative intent. 
 If each individual public institution of higher education had the power to determine
how public-sector education assets under its control could be "strategically utilized," there would
be dozens of decision-makers--an unnecessary duplication--and no single leader. Construing the
statutes to result in such a situation would render those sections creating the Coordinating Board
and designating it as the body to provide leadership and coordination for the Texas higher
education system nugatory. Permitting the Agreement to stand absent the Coordinating Board's
approval would not only deprive the Board of its statutorily prescribed role, but would also
undermine the Board's ability to perform its designated functions of coordinating public resources
and eliminating duplication.

 South Texas's argument that the Affiliation Agreement is merely a compact with
a private institution, and therefore does not come under the auspices of the Board's authority,
fails. Section 61.051 of the Education Code requires the Board to develop a five-year master plan
for higher education in the state; such plan must specifically take into account the resources of
private institutions of higher education in the state. Id. § 61.051(a). Even if the Agreement only
implicated the resources of a private institution, the Board's role in developing the State's master
plan for higher education would nevertheless be affected. However, the instant case presents a
situation beyond the mere expenditure of private resources. As previously stated, the Education
Code mandates that no funds appropriated to any institution of higher education be expended for
any program which has been disapproved by the Board. Id. § 61.054 (West 1996). Because the
Agreement is an exclusive affiliation, Texas A&M necessarily assumes responsibility for deciding
where some of its resources shall be placed. The Agreement also dictates that A&M "make
available to [South Texas] appropriate office space and related support personnel for use by a Law
School representative . . . ." Because the use of public property can constitute a use of public
funds, Op. Tex. Att'y Gen. Op. LO-97-077 (1997), and because the Agreement effectively allows
A&M to expend resources without Board approval or consideration, the Agreement necessarily
implicates authority reserved for the Board.

 Because courts generally construe statutes so as to give effect to the whole and
avoid rendering any portion surplusage, Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535,
540 (Tex. 1981), Barr v. Bernhard, 562 S.W.2d 844, 849 (Tex. 1978), we cannot ignore those
portions of the Education Code confirming the Coordinating Board's role as the highest authority
in matters of public education. We accordingly overrule appellants' issues to the extent they
contend that the Affiliation Agreement does not violate public policy.


Limitation on University's Authority under the Education Code

 In its motion for summary judgment, the Coordinating Board argued that by
entering into the Agreement, Texas A&M not only infringed on the authority of the Coordinating
Board, but also exceeded the University's own authority. A&M's governing board possesses
broad power to govern and manage the University. See Tex. Educ. Code Ann. §§ 85.21, 86.02
(West 1991). However, the Education Code limits A&M's powers to performing acts that are
related to the University's approved role as an institution of higher education. See id. § 61.002(b)
(West 1996) (charging Coordinating Board with aiding institutions of higher education to realize
their full potential "within their prescribed role and scope"); see also Foley v. Benedict, 55
S.W.2d 805, 808 (Tex. 1932) (noting that public universities' exercise of delegated powers is
subject to abuse-of-discretion review); Starr County v. Starr Indus. Servs., Inc., 584 S.W.2d 352,
355-56 (Tex. Civ. App.-Austin 1979, writ ref'd n.r.e.) (commenting that agency abuses
discretion when it acts outside delegated powers); Op. Tex. Att'y Gen. No. MW-475 at 4 (1982)
(advising that university can only bind state to extent of its delegated authority); MW-373 at 2
(1981) (stating that university board of regents must exercise powers of governance for purpose
of higher education); WW-334 at 3-4 (1958) (advising that university's educational television
station could broadcast commercial programs if it had "reasonable relationship to the authorized
purposes of said station, and to the statutory purposes of the college"); WW-5 at 6 (1957) (stating
that university could engage in educational television broadcasting if "such activity is reasonably
necessary for the accomplishment of the statutory purposes of the College and within the
legitimate objects of its creation"). (1)

 The Education Code requires that each institution of higher education have a role
and mission statement. See Tex. Educ. Code Ann. § 61.0511 (West 1996). The legislature has
charged the Coordinating Board with adopting criteria to be used in reviewing the role and
mission statements and has required that institutions apply to the Board for approval in order to
make changes. See id. § 61.051(d). The Coordinating Board's rules provide that an institution's
mission statement consists of its (1) table of programs, (2) mission description, (3) historical
statement, and (4) additional background information. See 19 Tex. Admin. Code § 5.350 (2000). 

 Neither A&M's mission description nor its table of programs state that instruction
in law is within A&M's role and mission. An institution's table of programs includes all degree
and certificate programs currently authorized for that institution; A&M's table of programs is
blank next to "Law & Legal Studies." Under agency rules, a blank means that a degree program
has not been approved for the institution and that such a program does not fall within the
institution's approved mission. See id. § 5.351 (2000). According to the legend on A&M's table
of programs, the blank also means that "[t]he institution has no degree programs and no planning
authority in the category." (Emphasis added.) The Agreement expressly states that the affiliation
would "broaden[] [A&M's] coverage of the academic disciplines." In attempting to "broaden[]
its coverage of the academic disciplines," A&M is attempting to expand its role and mission
without prior Board approval in violation of section 61.051. See Tex. Educ. Code Ann. §
61.051(d).

 Appellants contend that the Affiliation Agreement does not envision A&M offering,
or planning to offer, a law degree; thus, they argue, the Agreement is beyond the concern of the
Board. Again, we disagree. In the Agreement, the parties promise to "take such action as may
be necessary or appropriate from time to time to foster the effective assimilation of [South Texas]
graduates, students, administration and faculty into all aspects of [A&M's] culture and affairs." 
(Emphasis added.) The Agreement expressly provides that an operating committee of South Texas
and A&M representatives will meet at least twice a year to discuss joint degrees, combined
degrees, and certification programs, and that an affiliation committee of representatives from both
institutions will meet as needed to discuss "development and joint and combined degree plans." 
The Agreement also allows Texas A&M to plan for ultimately issuing a law degree by implicating
A&M in the hiring and administration at South Texas; the Agreement allows A&M to have input
regarding candidates for tenure and faculty appointments at South Texas, allows A&M to have
representatives present on the Board of Directors, Executive Committee of the Board of Directors,
each other standing committee of the Board of Directors, Operating Committee, and Admissions
Committee, and allows A&M's President to submit to South Texas's Board of Directors an
evaluation of the law school's President and Dean and make recommendations for a replacement
for South Texas's President and Dean should the position become vacant. In addition, the record
contains evidence of A&M's own president stating, "It has been our ambition for many years to
have a law college." Clearly the Affiliation Agreement contemplates more than merely
"enhancing" A&M's existing programs; it represents a conspicuous step in planning for the
addition of legal studies and for a law degree to be issued by A&M, an action for which A&M
now lacks authority. Before A&M can even "plan" to expand its role and mission, it must gain
approval of the Board.

 As noted in the Coordinating Board's summary judgment motion, a public
institution may not add any "new department, school, degree program, or certificate program . . .
except with specific prior approval of the [Coordinating B]oard." Id. § 61.051(e). "New" is a
relative term. See Mills County v. Brown County, 29 S.W. 650, 651 (Tex. 1895); Mathis Equip.
Co. v. Rosson, 386 S.W.2d 854, 858 (Tex. Civ. App.--Corpus Christi 1964, writ ref'd n.r.e.). 
As the Attorney General noted in considering whether A&M needed permission to offer an
approved program on the premises of Arlington State College, a "new" program or school can
be created when an old result is achieved in a new way. Op. Tex. Att'y Gen. No. WW-10 at 3
(1957). The same logic applies here. Even if, as appellants contend, the Affiliation Agreement
merely allows A&M to offer existing, approved programs in different ways, changing the way
in which A&M offers the existing programs would create "new" programs requiring Coordinating
Board approval. (2) 

 We are likewise unpersuaded by appellants' argument that the Affiliation
Agreement fulfills the legislative directive that the Coordinating Board encourage cooperation
between public and private institutions of higher education. Section 61.064 provides that the
Coordinating Board shall "(2) encourage cooperation between public and private institutions of
higher education wherever possible and may enter into cooperative undertakings with those
institutions on a shared-cost basis as permitted by law; . . . and (4) cooperate with these private
institutions, within statutory and constitutional limitations, to achieve the purposes of this
chapter." Tex. Educ. Code Ann. § 61.064 (West 1996). As the Coordinating Board noted in its
motion for summary judgment, however, this section only addresses the Board's authority to enter
into these cooperative undertakings. The Education Code does direct the Board to encourage
cooperative programs and agreements among institutions of higher education, including
agreements relating to degree offerings and library sharing. Id. § 61.051(o). Even assuming this
section relates to agreements between public and private institutions, it clearly suggests Board
involvement. The Coordinating Board decided that this Affiliation Agreement violated both
statutory and constitutional provisions. We overrule appellants' complaints that the trial court
erred by finding that the Agreement exceeds A&M's authority and infringes upon the
Coordinating Board's authority. Because we have held that general provisions of the
Agreement violate both the

law and public policy, we need not address appellants' contention that the Coordinating Board is
attempting, without authority, to regulate A&M's use of its name. Without regard to whether
A&M's name is used in connection with the affiliation, A&M has exceeded its authority by
implicating itself in the governance of a law school, thereby expanding its role and mission; this
it cannot do without Board approval.


Injunctive Relief

 We turn finally to A&M's argument that the district court erred in granting
injunctive relief. Our review of a district court's order granting or denying a permanent
injunction is strictly limited to a determination of whether there has been a clear abuse of
discretion by the trial court. Risk Managers Int'l, Inc. v. State, 858 S.W.2d 567, 569-70 (Tex.
App.--Austin 1993, writ denied); Priest v. Texas Animal Health Comm'n, 780 S.W.2d 874, 875-76
(Tex. App.--Dallas 1989, no writ).

 Section 61.301 of the Education Code is a clear reflection of the State's policy that
academic terminology in naming or otherwise designating educational institutions, as well as
advertising, solicitation, or representation by educational institutions, should not be deceiving or
confusing to the public. See Tex. Educ. Code Ann. § 61.301 (West 1996). The summary
judgment record reveals that the district court affirmatively requested, and carefully considered,
evidence on the issue of confusion to the public, as well as responsive evidence as to why an
injunction should not be entered. Such evidence defeats the argument that the district court abused
its discretion in granting injunctive relief. Having determined that the Agreement is void because
it violates the imperatives of the Education Code and public policy as expressed in the Code, the
trial court was within its discretion in ordering A&M and South Texas to cease acting or
purporting to act under the terms of the void Agreement. We accordingly overrule A&M's issue
regarding the propriety of injunctive relief. (3)


CONCLUSION


 Having determined that the district court did not err (1) in granting summary
judgment on the basis that appellants' Affiliation Agreement violated the laws and public policy
of this state and is therefore void and (2) in ordering appellants to cease operating pursuant to the
void Agreement, we affirm the district court judgment.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed 

Filed: November 30, 2000

Publish

TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00453-CV






South Texas College of Law and Texas A&M University, Appellants



v.



Texas Higher Education Coordinating Board, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. 98-03828-A, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING 









DISSENTING OPINION







 I write briefly in dissent.

 That South Texas College of Law ("South Texas") and Texas A&M University
("A&M") have entered into a far-reaching agreement (the "Affiliation Agreement"), which the
Texas Higher Education Coordinating Board (the "Coordinating Board") asserts is the first step
toward A&M's establishing a college of law, is undisputed. The record reflects that their actions
may in fact be designed to ultimately reach that end. However, I disagree with the majority
because I believe that the two institutions have not yet taken action that comes within the purview
or requires the approval of the Coordinating Board.

 The Coordinating Board is given an extremely narrow and restricted charge by the
legislature: "It shall perform only the functions which are enumerated in [the Education Code]
and which the legislature may assign it." Tex. Educ. Code Ann. § 61.021(a) (West 1996). The
legislature has carefully enumerated the Coordinating Board's functions. See id. §§ 61.051-.084
(West 1996 & Supp. 2000).

 The majority holds that the Affiliation Agreement "usurp[s] the Coordinating
Board's singular purpose and frustrate[s] clear legislative intent." Supra at 136. (4) In so holding,
the majority reads too broadly the intent of the legislature. The Affiliation Agreement does not
create a new degree program or change the role or mission of A&M. See Tex. Educ. Code Ann.
§ 61.051(d) (West Supp. 2000) & § 61.0511 (West 1996). It neither initiates nor consolidates a
degree or certificate program. See id. § 61.051(e) (West Supp. 2000). A&M has not expended
funds for a program disapproved by the Coordinating Board. See id. § 61.054 (West 1996). 
Arguably, the Affiliation Agreement may signal A&M's decision to do such things, and, if A&M
proceeds without Coordinating Board approval, the university may exceed its delegated authority
and infringe on that possessed by the Coordinating Board.

 I do not believe that, because the Coordinating Board is "the highest authority in
the state in matters of public higher education," (5) it has the power to expand its enumerated
functions in order to prohibit or discourage cooperative efforts between public and private
institutions. The legislature has specifically instructed that the Coordinating Board "shall . . .
encourage cooperation between public and private institutions of higher education wherever
possible and . . . cooperate with these private institutions, within statutory and constitutional
limitations, to achieve the purposes of this chapter." Id. § 61.064 (West 1996). Clearly, the
Coordinating Board is not encouraging the public-private cooperation envisioned by the legislature
in the Education Code. The majority holds that the Coordinating Board may not do so in this case
because the Coordinating Board "decided that this Affiliation Agreement violated both statutory
and constitutional provisions." Supra at 139. The majority reaches this result, in part, because
it construes the Affiliation Agreement to expand A&M's role and mission without Coordinating
Board approval. See Tex. Educ. Code Ann. § 61.051(d) (West Supp. 2000); supra at 138-39. 
By the Affiliation Agreement, A&M does not establish a law-degree program. To do so, A&M
must seek Coordinating Board approval to amend its mission statement, table of programs, and
degree program. See Tex. Educ. Code Ann. § 61.051(d), (e). Until that time, section 61.064
would seem to mandate that the Coordinating Board encourage cooperation between the two
institutions. Encouraging such cooperation does not obligate the Coordinating Board to ultimately
approve any expanded degree program submitted by A&M.

 This case presents a close question concerning the extent of the powers of the
Coordinating Board. The relationship created by the Affiliation Agreement may or may not prove
to be satisfactory. It is quite possible that South Texas and A&M may need, but not receive,
Coordinating Board approval to go farther. But the next step is not the question before us. I
believe that the legislature has not granted the Coordinating Board authority over the arrangement
created by the Affiliation Agreement. I agree with South Texas that the agreement is a compact
between public and private institutions and does not come under the auspices of the Coordinating
Board's limited authority. Where the legislature has narrowly restricted a public body's authority,
courts should not construe the legislature's action in such a way that the body's authority is
expanded. I fear that the result of today's decision is to grant the Coordinating Board overarching
authority to review cooperative agreements between institutions of higher education. I do not
believe that end to be the intent of the legislature. I would, therefore, hold that by entering into
the Affiliation Agreement A&M did not exceed its authority, the Coordinating Board does not
have the authority to review and approve it, and the agreement does not violate state law. I would
reverse the district court's judgment and render judgment for South Texas and A&M. Because
the majority does otherwise, I respectfully dissent.



 

 Lee Yeakel, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Filed: November 30, 2000

Publish

1. We recognize that the Attorney General's opinions are not binding on this Court;
nevertheless, we consider them persuasive here as there is otherwise limited authority in this area,
and because that office has repeatedly interpreted these sections of the Education Code since the
inception of the Coordinating Board. See Eddins-Walcher Butane Co. v. Calvert, 298 S.W.2d 93,
96 (Tex. 1957); Lyon v. State, 766 S.W.2d 879, 884 (Tex. App.--Austin 1989, writ ref'd).
2. We also note that if A&M were to offer courses in its existing programs through South
Texas, such action would interfere with the Coordinating Board's power to "order the deletion
or consolidation of any courses . . . after giving due notice with reasons for that action and after
providing a hearing if one is requested by the governing board involved." Tex. Educ. Code Ann.
§ 61.052(c) (West 1996) (emphasis added). This power extends only to public institutions of
higher education. The Coordinating Board would be unable to order South Texas to delete or
consolidate a class being taken by an A&M student. In addition, allowing students to take South
Texas classes in fulfillment of A&M degree plans without first receiving Board approval could
constitute unauthorized offering of off-campus courses for credit. See id. § 61.051(j).
3. In addition, we do not address appellants' request at oral argument that we reform the
Agreement to make it conform with the requirements of law. Because the parties did not plead
that the contract resulted from mutual mistake, we question whether reformation would be proper
under these circumstances. See Champlin Oil & Refining Co. v. Chastain, 403 S.W.2d 376, 382
(Tex. 1965) (citing Black on Rescission and Cancellation, Sec. 11) (stating that equitable
reformation of written contract based upon premise that written memorandum of contract does not
truly reflect actual agreement of parties because of mutual mistake). At any rate, it does not
appear that A&M or South Texas requested reformation at the district court, and therefore we may
not address the issue. See Tex. R. App. P. 33.1 (requiring complaint be presented to trial court
before being raised on appeal). 
4. The substantive portion of the Affiliation Agreement is set forth in the majority opinion. 
See supra at 132-34.
5. Tex. Educ. Code Ann. § 61.051(a) (West Supp. 2000).


;M
must seek Coordinating Board approval to amend its mission statement, table of programs, and
degree program. See Tex. Educ. Code Ann. § 61.051(d), (e). Until that time, section 61.064
would seem to mandate that the Coordinating Board encourage cooperation between the two
institutions. Encouraging such cooperation does not obligate the Coordinating Board to ultimately
approve any expanded degree program submitted by A&M.

 This case presents a close question concerning the extent of the powers of the
Coordinating Board. The relationship created by the Affiliation Agreement may or may not prove
to be satisfactory. It is quite possible that South Texas and A&M may need, but not receive,
Coordinating Board approval to go farther. But the next step is not the question before us. I
believe that the legislature has not granted the Coordinating Board authority over the arrangement
created by the Affiliation Agreement. I agree with South Texas that the agreement is a compact
between public and